Benjamin H. STEINBERG,
Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 53A01–1001–CR–16.

Court of Appeals of Indiana.

Jan. 21, 2011.

Transfer Denied March 17, 2011.

Stacy R. Uliana, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Ellen H. Meilaender, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

In January 2005, Benjamin H. Steinberg purchased an AR–15 semiautomatic rifle equipped with a laser sight, a flash suppressor, and high-velocity ammunition. Steinberg showed the firearm to his roommates and told one of them that "if anything ever happened he could melt his gun to nothing" with welding tanks that he had in the back of his SUV. In the predawn hours of February 8, 2005, Steinberg drove alongside a Monroe County correctional officer who was on his way home from work and shot him in the head, killing him instantly. Later that morning, a dirty and frantic Steinberg arrived at his apartment with blackened hands and told his roommate, "Somebody was coming and I f* * *ed up." The next day, Steinberg told his roommate not to get a newspaper. Steinberg's roommate got a newspaper, read about the shooting, and relayed his suspicions about Steinberg's involvement to the police. Ultimately, Steinberg was charged with and convicted of murder and sentenced to sixty-five years in prison.

On appeal, Steinberg raises the following issues: (1) whether the trial court violated the Federal and Indiana Wiretap Acts by admitting recordings of phone calls that Steinberg made to his parents while in jail; (2) if not, whether the trial court erred in not further redacting those recordings; (3) whether the trial court erred in admitting a 2003 email in which Steinberg asked whether there were any "extenuating circumstances relating to murder that negate personal liability"; (4) whether the prosecutor committed misconduct during closing argument when he stated that the lesser-included offense of involuntary manslaughter did not apply in this case; (5) whether the trial court committed fundamental error in admitting evidence of Steinberg's pretrial references to legal counsel; (6) whether the trial court erred in not finding Steinberg's mental health to be a mitigating factor at sentencing; and (7) whether Steinberg's sentence is inappropriate in light of the nature of the offense and his character. Finding no reversible error and that Steinberg has failed to establish that his sentence is inappropriate, we affirm his conviction and sentence.

### Facts and Procedural History[1]

The facts most favorable to the jury's verdict indicate that in 2005, Steinberg shared an apartment with Kenith Craft and Ian Coleman in Bloomington. In Jan-

---

1. We remind Steinberg's counsel that the facts in an appellant's brief "shall be stated in accordance with the standard of review appropriate to the judgment or order being appealed." Ind. Appellate Rule 46(A)(6)(b).

uary 2005, Steinberg purchased an AR–15 semiautomatic rifle from a man in Martinsville for $800 in cash. The AR–15 was equipped with a bipod, laser sight, flash suppressor, and copper-jacketed ammunition capable of piercing the side of a motor vehicle.[2] Steinberg showed Craft and Coleman the AR–15, which he referred to as his "new toy." Tr. at 138.

Between approximately 7:00 and 8:30 p.m. on February 7, 2005, Steinberg received email confirmations from a gambling website regarding his requested withdrawals; which totaled $18,200. Later that evening, Steinberg, Craft, and Coleman met at a bar near their apartment. Eventually, Coleman left the bar and went to his girlfriend's apartment. Steinberg and Craft went outside the bar for a smoke, and Steinberg showed Craft two oxyacetylene welding tanks in the back of his Oldsmobile Bravada SUV. Steinberg told Craft that "if anything ever happened he could melt his gun to nothing." *Id.* at 137. Steinberg also told Craft that he had to be somewhere at 1:15 a.m. After midnight, Steinberg drove Craft back to their apartment and told him that he could play online poker on Steinberg's account and keep any money that he won. Steinberg left the apartment. Craft played poker on Steinberg's computer for approximately an hour and went to bed.

Early on the morning of February 8, Michael Helton was driving his semi truck northbound on State Road 37 south of Bloomington when he saw the headlights of two approaching vehicles traveling southbound.[3] One of the vehicles, a pickup truck, suddenly veered off the road and crashed into a limestone embankment. The second vehicle continued traveling southbound. Helton stopped and flagged down another trucker, who called 911.

Police determined that the driver of the pickup was William Brand, a correctional officer from the Monroe County Jail. Brand had been shot through the head and killed by a high-velocity copper-jacketed bullet. The bullet had been fired from a weapon positioned directly to Brand's left. The driver's side window of Brand's pickup was shattered, and a bullet had penetrated the driver's side door frame, on which police found gunshot residue. The forensic pathologist recovered from Brand's skull a copper-jacketed bullet fragment that was consistent with ammunition that can be fired by an AR–15. Police could not conclusively determine whether one or two shots had been fired and whether Brand's skull had been penetrated by a bullet or by a bullet fragment that had ricocheted off the door frame.

Later on the morning of February 8, as Craft was getting ready for work, a pale and frantic Steinberg entered the apart-

---

2. The man who sold the AR–15 to Steinberg testified that a laser sight "just puts a red dot on [the target] and that's where your bullet is going." Tr. at 231. He further testified that a flash suppressor

> looks like a little bird cage on the end of your barrel. Some call them recoil compressors as well, they'll take some of the kick out of the barrel to keep it steady so you can get right back on target after you've fired each round. And it also brakes up [sic] the flash of the fire at the end of the barrel to keep you kind of hidden, you know.

*Id.* at 234. The AR–15 is a civilian version of the military's M16 rifle, which the man said "even a child could use." *Id.* at 236.

3. At trial, the prosecutor asked Helton, "Now at the time that you saw the two vehicles side by side as you've described, was there any other traffic on highway 37 at that point in time that you observed?" Tr. at 39. Helton had not testified that the vehicles were side by side. We admonish the prosecutor to refrain from misrepresenting the record.

ment. He was dirty and appeared to have been crying, and his hands were black. Steinberg told Craft, "I f* * *ed up man I f* * *ed up, oh my God. The car slide [sic] down the road. Somebody was coming and I f* * *ed up, I f* * *ed up." *Id.* at 149. Steinberg told Craft that he had come home to get a checkbook and quickly left the apartment.

The next day, February 9, Steinberg and Craft had a brief conversation in their apartment. Steinberg told Craft, "If anyone comes around asking any questions or looking for me tell them the last time I talked to you I was going to Las Vegas. If you do anything, don't go get a newspaper today. If you get a newspaper don't bring it into this apartment, destroy it." *Id.* at 152. After the conversation, Steinberg left the apartment. Craft got a newspaper and read the account of Brand's shooting. Craft recalled Steinberg's recent behavior and comments and said, "Oh f* * *k." *Id.* at 154. When Craft was at lunch, Steinberg called him and asked if "anyone [had] been around." Id. at 160. Craft told Steinberg that no one had been around and that the newspaper article had indicated that the vehicle suspected of being involved in the shooting

was a "late model sedan." *Id.*[4] Steinberg replied, "Okay, so I'm cool." *Id.* Steinberg told Craft to tell Coleman that he "[n]ever saw that thing," which Craft took to mean the AR–15. *Id.*

Later that day, Craft discussed the matter with Coleman and called the Indiana State Police number listed in the newspaper article. Police interviewed Craft and Coleman and arrested Steinberg at a New Albany hotel on a probation violation based on his alleged possession of a firearm. Police also seized Steinberg's computer and SUV, in which they found molten metal fragments and recently purchased tools, including a shovel.[5] Police did not find the welding tanks that Steinberg had shown to Craft, nor did they find Steinberg's AR–15.[6]

Later that month, while Steinberg was incarcerated, he wrote a letter to Craft instructing him to "Talk to Noone [sic] unless my lawyer is with you" and "don't say sh*t w/out my lawyer—No matter what they say." State's Ex. 27. Steinberg also wrote letters to two friends, asking them to impersonate a police detective to determine whether police had obtained a surveillance videotape from a gas

---

4. Helton had described the vehicle to police as a "medium size vehicle." Tr. at 45. At his deposition, he described the vehicle as "a compact car ... like a Chevrolet Celebrity." *Id.* at 44. At trial, he testified that the vehicle was "a smaller vehicle than [Brand's] pickup truck." *Id.* at 39.

5. In closing argument, the prosecutor posited that Steinberg "bought tools and a shovel" and "clearly intended to gut the interior of that Bravada and dispose of the interior of that Bravada" but "was arrested before he could do so." Tr. at 426.

6. Steinberg makes much of the fact that the Indiana State Police sent the molten metal fragments to a laboratory for testing, which indicated that the metal "was not consistent

with a Bushmaster AR[-]15." Tr. at 401. At trial, Indiana State Police Sergeant Bradley Ayres explained that Steinberg's AR–15 was

> bits and pieces, it was like homemade. It had a Bushmaster stock and the upper receiver was something else, the bipod was who knows who made that? We had a lot of different metal and all of that has different metal (inaudible).... Bushmaster was the only thing I know that part of it was made of....

*Id.* at 402. As such, the metallic composition of a Bushmaster AR–15 stock was the only known standard against which the laboratory could test the molten metal fragments. The jury was free to draw the reasonable inference that the fragments could have come from the non-Bushmaster "bits and pieces" of the AR–15.

station near the intersection of State Road 37 and Highway 50 in Bedford. In one of the letters, Steinberg specified that the videotape was "from about 2–3 am on the early morning of Tues, February the 8th." State's Ex. 48.

On October 17, 2007, the State charged Steinberg with murder. On October 23, 2009, a jury found Steinberg guilty as charged. On December 16, 2009, the trial court sentenced Steinberg to sixty-five years in prison. This appeal ensued. Additional facts will be provided as necessary.

## Discussion and Decision

### I. Admission of Recordings

At trial, the State offered into evidence recordings of three collect phone calls that Steinberg made to his parents while he was incarcerated in the Floyd County Jail following his arrest in New Albany. During those conversations, Steinberg stated, among other things, that he had given his vehicle and cell phone and a gun he had purchased in Martinsville to masked men who killed a jailer in a drive-by shooting in Bloomington; that he had read about the shooting in the paper; and that he was being framed for the homicide because of his extensive knowledge of and involvement in nanotechnology. He also stated that he had planned on having his SUV repainted and reupholstered because he had been framed but that he had decided not to do so. The trial court admitted the recordings over Steinberg's objection that they had been obtained in violation of the Federal and Indiana Wiretap Acts.

▋ Steinberg contends that the trial court erred in admitting the recordings. Our standard of review is well settled:

We will afford a trial court's decision to exclude evidence great deference on appeal, and will reverse only for a manifest abuse of discretion that denies the defendant a fair trial. An abuse of discretion occurs when a decision is clearly against the logic and effect of the facts and circumstances before the trial court.

*Lovitt v. State,* 915 N.E.2d 1040, 1043 (Ind. Ct.App.2009) (citation omitted). We may affirm a trial court's admissibility ruling on any theory supported by the record. *Leitch v. State,* 736 N.E.2d 1284, 1286 (Ind.Ct.App.2000).

### A. Federal Wiretap Act

"The Federal Wiretap Act authorizes federal and state law enforcement officers to intercept wire, oral, or electronic communications in criminal investigations pursuant to a properly issued court order administered in compliance with specific guidelines." *Packer v. State,* 800 N.E.2d 574, 578–79 (Ind.Ct.App.2003) (citing 18 U.S.C. §§ 2516 and 2518), *trans. denied* (2004).

While the Federal Wiretap Act prohibits the interception and introduction into evidence of telephone communications unless a court order is obtained authorizing the interception of the telephone conversations, the statute also contains two exceptions, i.e. the ordinary course of business exception and the consent exception. The ordinary course of business exception provides, in pertinent part, that "an investigative or law enforcement officer in the ordinary course of his duties" may "intercept a wire, oral, or electronic communication" through an "electronic, mechanical, or other device." 18 U.S.C. § 2510(5)(a)(ii) (2000). The consent exception provides:

It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral or electronic communication where such person is a party to the communication or one of the parties to the communication or one of the parties to the

communication has given prior consent to such interception. ·

18 U.S.C. § 2511(2)(c) (2000).

*Id.* at 579 (footnote omitted).

■ "The ordinary course of business exception to the Federal Wiretap Act's court order requirement applies to taped telephone conversations from a jail." *Id.* Steinberg asserts that the State failed to establish that the conversations in this case "were taped in the ordinary course of business," claiming that it "never presented any evidence of Floyd County Jail's policy on recording phone conversations." Appellant's Br. at 12. The State points out that at the beginning of each phone call, the operator announced, "This call may be recorded." Appellant's App. at 431a, 431o, 431ee. We agree with the State that "[t]his is evidence that the jail routinely monitors and records phone calls made by inmates" and that, contrary to Steinberg's assertion, "it was unnecessary for the State to also introduce into evidence [a] jail handbook providing the same information already provided in the calls themselves." Appellee's Br. at 11.[7] *Cf. Baer v. State,* 866 N.E.2d 752, 762 (Ind. 2007) (rejecting appellant's argument that State must show that he "received and understood the jail handbook" as a "foundational requirement[ ] for establishing consent" to his phone calls being recorded for purposes of Indiana Wiretap Act). In other words, we conclude that the recordings were made in the ordinary course of business for purposes of the Federal Wiretap Act and thus the trial court did not abuse its discretion in admitting them. Because we affirm the trial court's ruling

on this basis, we need not address the applicability of the Act's consent exception.

### B. Indiana Wiretap Act

■ Steinberg's argument that the recording and admission of his phone conversations violated the Indiana Wiretap Act is based solely on his unsuccessful argument regarding the Federal Wiretap Act. *See* Appellant's Br. at 14 ("[B]ecause there is a violation of the Federal Wiretap Act, it follows the Indiana Wiretap Act was also violated."). Steinberg's argument rests on a faulty premise, and he has failed to develop any other argument on this point. Thus, he has failed to establish an abuse of discretion. In any event, as the State correctly observes, Steinberg's "parents consented to the recording when they accepted the collect calls after being warned that the calls could be recorded, and this alone is sufficient to render the recordings proper under the Indiana Wiretap Act." Appellee's Br. at 16 (citing *Edwards v. State,* 862 N.E.2d 1254, 1261–62 (Ind.Ct. App.2007), *trans. denied* ).

### II. Redaction of Recordings

Prior to trial, the State informed Steinberg that it intended to introduce the recordings of his conversations with his parents "in their entirety." Appellant's App. at 425 (memorandum in support of Steinberg's motion in limine). As stated above, Steinberg unsuccessfully sought to exclude the recordings based on alleged violations of the Federal and Indiana Wiretap Acts. In the alternative, Steinberg requested the redaction of his mother's and father's

7. Steinberg also asserts that "[t]here is no evidence that Floyd County Jail provides a procedure for requesting confidential phone calls. Such a procedure is required in order for the Floyd County Jail's policy to be consistent with the Sixth Amendment and Article I, Section 13 [of the Indiana Constitution] right

to counsel." Appellant's Br. at 12. We note that the phone calls at issue were made to Steinberg's parents, not to his attorney, and that Steinberg fails to explain how a violation of those provisions constitutes a violation of the Federal Wiretap Act.

statements on several grounds, including hearsay and relevancy.

The trial court held a hearing on the matter during trial. The court denied Steinberg's request to redact all of his parents' statements on the basis that "conversations need to be taken in ... context" and that "[i]f you take one side out and leave one side there is no clarity and it becomes nonsensical and difficult for the jury." Tr. at 278. The court and the parties reviewed the transcripts of the recordings line by line, and the court redacted certain statements uttered by Steinberg and his parents. For example, the court redacted Steinberg's statement that he had been arrested for a probation violation, Appellant's App. at 431x, his father's question regarding whether police had conducted a ballistics test, *id.,* and his mother's statements explicitly expressing doubt about his mental health, credibility, and innocence. *See, e.g., id.* at 431kk ("Your story Ben is part and partial [sic] of your illness."), 431nn ("I don't think you know what really happened Ben."), 431ss ("It makes no sense."), 431yy ("Oh my God. Oh my God you shot some one [sic]."), and 431zz ("[Y]ou are suffering from an illness that you will not address."). The recorded conversations were redacted accordingly and played to the jury. There is no indication that the jury viewed the unredacted transcripts.

On appeal, Steinberg renews his assertion that the trial court erred in failing to redact all of his parents' utterances, contending that "[t]he State's desire to present [his] statements in the context of a

flowing conversation does not trump [his] right to a fair trial within the confines of the Rules of Evidence." Appellant's Br. at 9.[8] Steinberg's overarching argument appears to be that his parents' statements are inadmissible because they are irrelevant. *See* Ind. Evidence Rule 401 (defining "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); Ind. Evidence Rule 402 ("All relevant evidence is admissible, except as otherwise provided by the United States or Indiana constitutions, by statute not in conflict with these rules, by these rules or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible.").

 "In order to be admissible, the evidence need only have some tendency, however slight, to make the existence of a material fact more or less probable, or tend to shed any light upon the guilt or innocence of the accused." *Simmons v. State,* 717 N.E.2d 635, 638 (Ind.Ct.App. 1999). The statements of Steinberg's parents provide a critical context for Steinberg's own statements, the relevancy of which Steinberg does not (and cannot) dispute. We agree with the trial court that removing his parents' statements from the conversations would have rendered the recordings "nonsensical and difficult for the jury." Tr. at 278. Under these circumstances, we conclude that the statements of Steinberg's parents are at least minimally probative, and we cannot conclude

---

8. On appeal, Steinberg has abandoned his argument that his parents' statements constitute inadmissible hearsay. It appears that he has also abandoned his argument that his parents' statements are inadmissible pursuant to Indiana Evidence Rule 106, which states, "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require at that time the introduction of any other part or any other writing or recorded statement which in fairness ought to be considered contemporaneously with it." Given that the State sought to introduce the phone conversations in their entirety and that Steinberg sought to redact them, we fail to see how Evidence Rule 106 is applicable here.

that the trial court abused its discretion in denying Steinberg's request to redact all of his parents' statements on relevancy grounds.[9] We now address Steinberg's more specific arguments regarding their admissibility.

### A. Mother's Statements

■ Steinberg's arguments regarding the admissibility of his mother's statements focus primarily on Indiana Evidence Rules 704(b) and 403, as well as an order in limine regarding evidence that he suffered from mental illness.[10] Evidence Rule 704(b) states, "Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a wit-

ness has testified truthfully; or legal conclusions." Steinberg contends that his mother's tone of voice and repetitive questioning expressed disbelief and that her responses to his references to masked men and nanotechnology "directly attacked [his] truthfulness, sanity and innocence." Appellant's Br. at 17.[11]

Steinberg's contention is unpersuasive. The State correctly observes that "[t]here is no rule of evidence that excludes statements because of the 'tone of voice' in which they are made" and that none of the objectionable statements cited by Steinberg "express[es] a direct opinion as to [his] guilt, the truth of [his] statements, or [his] sanity." Appellee's Br. at 16–17.[12] As Judge Robert L. Miller, Jr., has ex-

---

**9.** Steinberg contends that "[e]ven if the State or the trial court believed the recording was too confusing without his mother's statements, the State could have called [his] mother so she could testify as to Steinberg's side of the conversation." Appellant's Br. at 20. Simply because the State could have called Steinberg's mother to testify does not mean that the trial court abused its discretion in admitting her recorded statements.

**10.** Steinberg also baldly asserts violations of Evidence Rules 404 and 405 but fails to develop a cogent argument regarding their applicability. Therefore, this argument is waived. *McReynolds v. State*, 901 N.E.2d 1149, 1154 (Ind.Ct.App.2009).

**11.** Specifically, Steinberg contends that

[e]very "why", "what"; "ohh", "yeah" and "what happened" had atone of disbelief. [Steinberg's mother] challenged the logic of her son's story by asking with the same tone of disbelief questions such as "and they wear masks?" and "what threat do they have over you" and then later stating, "Don't tell me about some unknown people who wear masks that take your cell phone and your car and your rifle," and "why would you do such a thing." She stated Steinberg's name fifteen times, often yelling "No, Ben", trying to get him to stop talking about nanotechnology, masked men, etc. Finally, she yelled at him to stop.

.... When Steinberg told his mother that he did not have a gun on him but he was arrested for the gun, she claimed "something is not right." After Steinberg stated, "I have an extensive knowledge about a bunch of Technologies Mom. Nanotechnology," she stated, "I know nanotechnology and the whole world is going to be eaten up and we're related to the Queen of England." Subsequently, when he began discussing nanotechnology again, she pled "don't tell me about some unknown people who wear masks and that take your cell phone and your car and your rifle" and "oh Ben if I hear about this nanotechnology one more time I'm going to weep." In response to Steinberg's protest that nanotechnology is a "very real thing," she responded "yeah I know it is but not to the degree that your mind is letting it be."....

.... Even after Steinberg vehemently protested that he did not shoot anyone, she again asked whether he shot someone. She asked him at least three times whether he had a gun on him despite his protests that he did not. She asked three times where the shooting took place, and five times who had his cell phone.

Appellant's Br. at 17–18 (citations omitted).

**12.** The practical difficulties of scrutinizing a witness's tone of voice for purposes of Evidence Rule 704(b) are too numerous to mention.

plained, "Rule 704(b) does not prohibit presentation of evidence that leads to an inference, even if no witness could state [an] opinion with respect to that inference." 13 ROBERT LOWELL MILLER, JR., INDIANA PRACTICE § 704.201 at 589 (3d ed.:2007). Thus, Steinberg's mother's statements do not run afoul of Evidence Rule 704(b).

■ Evidence Rule 403 states, "Although relevant, evidence may be excluded if its probative value is *substantially outweighed* by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." (Emphasis added.) Steinberg asserts that

[t]he danger of unfair prejudice here is the real possibility that the jury used Steinberg's mother's statements to infer she did not believe in her son's innocence. There is nothing more damning to a defendant's protests of innocence than evidence or argument that his own mother does not believe him. This unfair prejudice substantially outweighs any probative value [his] mother's statements may have had.

Appellant's Br. at 19.

The State responds that some of Steinberg's mother's statements ·

might suggest that she does not believe everything [he] is saying to her, but that is not at all the same thing as suggesting that she thinks he is guilty of murder. The statements that would have been prejudicial in this regard were redacted

by the trial court. And the vast majority of what [his] mother says has no prejudicial effect at all. She is simply asking questions to try to understand why her son is in jail.

Appellee's Br. at 18. We agree with this assessment and conclude that Steinberg has failed· to ·establish that the probative value of his mother's statements is substantially outweighed by the danger of unfair prejudice pursuant to Evidence Rule 403.

### B. Father's Statements

■ Steinberg says that "[a] large portion of [his] calls with his father dealt with his father's problem relating to selling his condo, and his father objecting to [his] cussing." Appellant's Br. at 20. He further states that "it is clear from the audiotape that [his] father was intoxicated during the first call" and asserts that "[t]he risk that the jury would infer Steinberg's character from his relationship with his father or his father's alcohol problem substantially outweighs the need for the jury to hear about Steinberg's father's problems selling his condo." *Id.* at 21.[13]

The State responds that Steinberg does not explain how he was *prejudiced* by statements that he alleges create the appearance that his father was "uncaring" as to [his] predicament. If anything, such an appearance would awaken sympathy in the jurors for [Steinberg]. Similarly, even if [his] father was intoxicated, [Steinberg] does not explain how that, in and of itself, constitutes prejudice.

13. Steinberg also asserts that the following statement by his father should have been excluded pursuant to Evidence Rules 704 and 403: " 'But, uh, yeah, I've, I know how you get railroaded. I don't know how you'd give your car to somebody that you don't know their name but.' " Appellant's Br. at 21 (quoting Appellant's App. at 431aa). In our view, this statement indicates that Steinberg's father believed that his son was framed and was merely questioning why he would have given his car to someone he did not know. At the very least, the statement does not definitively express an opinion as to Steinberg's innocence or truthfulness. As such, we find no merit in Steinberg's assertion.

Appellee's Br. at 19. Once again, we agree with the State's assessment. Absent any demonstration of prejudice, much less any demonstration that the probative value of Steinberg's father's statements was *substantially* outweighed by the danger of unfair prejudice pursuant to Evidence Rule 403, we find no abuse of discretion in the trial court's denial of Steinberg's request to further redact his father's statements.

### III. Admission of Email

At trial, the State offered into evidence an email that Steinberg sent to what appears to be a United Kingdom governmental law commission on October 20, 2003. The subject line reads, "Acceptions [sic] to Murder," and the text of the message reads, "Are there any extenuating circumstances relating to murder that negate personal liability. I am referring to circumstances such as fear of personal harm. Thank you for any info." State's Ex. 30. Steinberg objected to the email based on its temporal remoteness to Brand's killing and on relevancy and Evidence Rule 403 grounds. The prosecutor responded that the email's "remoteness makes it relevant. The defense has been attempting to suggest that [Kenith] Craft is responsible for this crime. This email predates their living together and . . . it has to do with the very crime that we're here on trial for." Tr. at 252. The trial court ruled as follows:

> Do I think that it's relevant based upon the testimony so far in this trial? Yes, I do. Do I think that there may be some

prejudice to Mr. Steinberg? Perhaps. Do I think it outweighs the relevance? No. Once again do I believe it's admissible? Yes. The jury can give it whatever weight they want to give it from 2003, but based upon the way the testimony has gone in the courtroom so far, I think it's relevant.

*Id.* at 254.

■■■ On appeal, Steinberg contends that "the nexus between [his] two-line email and the shooting of Brand approximately sixteen months later is far too attenuated to be probative of any plan to kill Brand." Appellant's Br. at 22. We agree. Absent any evidence linking the email to the apparently random and motiveless killing of Brand, we fail to see how it was probative of any fact of consequence to the determination of the action, including the identity of Brand's killer.[14] Quite simply, the email does not tend to prove that Steinberg killed Brand, or that he was more likely than Craft to have killed Brand, and therefore the trial court abused its discretion in admitting it.

■■■ That said, we conclude that the error was harmless. "The improper admission of evidence is harmless error when the conviction is supported by substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction." *Cook v. State,* 734 N.E.2d 563, 569 (Ind. 2000). It is well settled that "[a] murder conviction may be based entirely on circumstantial evidence." *Oldham v. State,* 779 N.E.2d 1162, 1168 (Ind.Ct.App.2002).

---

14. We note that Steinberg sent the email nine days before his mother brought him to a mental health center for a psychiatric evaluation and emergency detention. *In re Commitment of Steinberg,* 821 N.E.2d 385, 387 (Ind. Ct.App.2004). At the time of Steinberg's involuntary commitment hearing in November 2003, he "had charges pending against him for public intoxication and for pointing a firearm. The firearm charge stemmed from an incident in which Steinberg pointed an unloaded gun at a group of three people who threatened him and his roommate." *Id.* One could reasonably infer that Steinberg's email was related to this incident, rather than to Brand's murder more than one year later.

The State presented plenty of circumstantial evidence linking Steinberg to Brand's murder, including his purchase of a laser-sighted rifle and ammunition that was consistent with that used to kill Brand; his conversations with Craft before and after the killing; his appearance, behavior, and comments after the killing, as described by Craft; the disappearance of his rifle and welding tanks after the shooting; his jailhouse phone conversations with his parents; and his attempts to track down a gas station surveillance video from the day of the killing. Steinberg had no alibi, and his attempt to cast suspicion on Craft at trial was undercut by his pretrial statements to his parents that he did not know the names of Brand's supposed killers and that Craft had heard Steinberg talking to them. Appellant's App. at 431t, 431kk. Based on the foregoing, we conclude that there is no substantial likelihood that the admission of Steinberg's email contributed to his conviction.

### IV. Prosecutorial Misconduct

The identity of Brand's killer was the primary issue contested at Steinberg's trial for murder, which is the knowing or intentional killing of another human being. Ind.Code § 35–42–1–1. During closing argument, however, Steinberg's counsel raised the issue of intent:

[T]here has to be some indication that it was intentional. Perhaps it was believe it or not reckless. Perhaps somebody has a firearm and they're messing around with it and it goes off. And we'll talk about that. Because that would be a crime too. It just would not be murder. It would be involuntary manslaughter, and you'll receive an instruction on that that I'll discuss later.

. . .

[T]he Judge is going to instruct you as to what . . . we call lesser included offense. And you're going to receive an instruction from the Court that says that if you believe the State has not met its burden with respect to murder, you can consider the lesser included offense of involuntary manslaughter. And in order to do that you would have to show that the crime of criminal recklessness took place and I'm going to show you how that is going to be defined by the Court, just briefly. The crime of criminal recklessness is defined by statute as follows: A person who knowingly, or intentionally performs an act that creates a substantial risk of bodily injury to another person commits criminal recklessness; a class D Felony if committed while armed with a deadly weapon, or a [c]lass C Felony if it is committed by shooting a firearm from a vehicle into a place where people are likely to gather. And I think a car would fall into that category. . . . [I]f you believe that there's sufficient evidence that there was an act of criminal recklessness and as a result this event happened, you . . . can find involuntary manslaughter.

Tr. at 433, 452–53.

On rebuttal, the prosecutor responded as follows:

The Defendant tells his mother that somebody used my gun in a drive by, a drive by. The Defendant tells his father they can't prove it was me. I have no motive. Drive by equals no motive. A drive by is the type of murder that is comparable to a terrorist act where you have no motive. You select your victim at random. It's not a situation where you're firing randomly into some gathering of folks. You actually pick out your victim but you have picked them randomly. You don't know them. They are innocent. But you shoot and kill them. Involuntary manslaughter, even though this offense includes incidences

[sic] where a firearm was discharged from a vehicle it addresses (inaudible) and involuntary manslaughter. It addresses situations where the firing of the weapon is random. There is no specific target. In this case Bill Brand is alone in his truck on State Road 37. There were no other vehicles in his vicinity. He was specifically targeted, even if no motive existed to kill him. Involuntary manslaughter does not apply to this case.

*Id.* at 454–55.

At that point, Steinberg's counsel requested a sidebar. According to counsel's verified statement of evidence submitted to and certified by the trial court pursuant to Indiana Appellate Rule 31(A),[15] the sidebar was not transcribed by the court reporter because it was inaudible. Steinberg's trial counsel "recollects that during the inaudible sidebar he objected on the grounds that the prosecutor misstated the law" but "does not remember whether he requested an admonishment and mistrial." Appellant's App. at 598f. The trial court apparently overruled counsel's objection and neither admonished the jury nor declared a mistrial.

Later, the court instructed the jury regarding involuntary manslaughter as follows:

The Defendant is charged with Murder, a Felony. Involuntary Manslaughter, a Class C Felony is an included offense of the charge of Murder. An included offense is an offense that includes all or less than all of the material elements of the offense charged. If the State proves the Defendant guilty of the offense of Murder, you need not consider the included crime. However, if the State fails to prove the Defendant committed Murder, you may consider whether the Defendant committed Involuntary Manslaughter, which the court will define for you.

You must not find the Defendant guilty of more than one crime.

. . . .

The crime of involuntary manslaughter is defined by statute as follows:

A person who kills another human being while committing or attempting to commit a Class C or Class D felony that inherently poses a risk of serious bodily injury, commits involuntary manslaughter, a Class C felony.[16]

To convict the defendant the State must have proved each of the following elements:

The defendant:

1. killed William Brand,

2. while committing or taking a substantial step to commit,

3. the crime of criminal recklessness, as a Class C or D felony,

4. and the criminal recklessness inherently posed a risk of serious bodily injury.

If the State failed to prove each of these elements beyond a reasonable doubt, you should find the defendant not guilty.

If the State did prove each of these elements beyond a reasonable doubt, you should find the defendant guilty of

---

**15.** *See* Ind. Appellate Rule 31(A) ("If no Transcript of all or part of the evidence is available, a party or the party's attorney may prepare a verified statement of the evidence from the best available sources, which may include the party's or the attorney's recollection. The party shall then file a motion to certify the statement of evidence with the trial court or Administrative Agency. The statement of evidence shall be attached to the motion.").

**16.** Ind.Code § 35–42–1–4(c).

involuntary manslaughter, a Class C felony.

. . . .

The crime of criminal recklessness is defined by statute as follows:

> A person who knowingly, or intentionally performs an act that creates a substantial risk of bodily injury to another person commits criminal recklessness; A Class D felony if it is committed while armed with a deadly weapon, or a Class C felony if it is committed by shooting a firearm from a vehicle into a place where people are likely to gather.[17]

. . . .

A person engages in conduct "knowingly" if, and when he engages in the conduct, he is aware of a high probability that he is doing so.

A person engages in conduct "intentionally" if, and when he engages in the conduct, it is his conscious objective to do so.

*Id.* at 519–22.

On appeal, Steinberg contends that "[t]he prosecutor's argument was a purposeful misstatement of the law" that requires reversal. Appellant's Br. at 25. Specifically, Steinberg asserts that

> [t]here is no evidence of legislative intent to limit Class C felony criminal recklessness based on shooting from a car to situations where a defendant is unaware if a person is inside the car or home.... [E]ven assuming Steinberg knowingly aimed the gun in the direction of Brand and his vehicle, this fact alone would not preclude a conviction as to criminal recklessness rather than murder. Although aiming in the direction of a victim or occupied home

can constitute murder, it is an issue for the jury to decide....

. . . .

> .... Because of the prosecutor's uncontradicted misstatement in his rebuttal, the jury believed involuntary manslaughter was not even an option as long as Steinberg meant to shoot at Brand's vehicle, knowing Brand was in the truck. Such is not true. If Steinberg reasonably believed that the bullet may not hit Brand, Steinberg did not possess the requisite intent for murder and was only guilty of involuntary manslaughter.

*Id.* at 25–27 (citation omitted).

■■■ Initially, we note that

> [w]hen faced with alleged prosecutorial misconduct, a defendant is required to object and request an admonishment. If, after an admonishment, the defendant is still not satisfied, the proper procedure is to move for mistrial. The failure to request an admonishment or move for mistrial results in waiver of the issue.

*Watkins v. State,* 766 N.E.2d 18, 25 (Ind. Ct.App.2002) (citations omitted), *trans. denied.*

The State contends that "[b]ecause the record does not show that [Steinberg] either requested an admonishment or moved for a mistrial, his claim is unpreserved." Appellee's Br. at 26. In his reply brief, Steinberg contends that his trial counsel's certified statement that he did not remember whether he had either requested an admonishment or moved for a mistrial "is sufficient to preserve the issue for appeal." Appellant's Reply Br. at 13. Because the record is silent on this point through no fault of Steinberg, and given our oft-stated preference for deciding issues on their merits, we will assume for purposes of this

---

**17.** Ind.Code § 35–42–2–2(b) and -(c).

appeal that the issue has been preserved and address Steinberg's argument.

 "If an appellant properly preserves the issue of prosecutorial misconduct for appeal the reviewing court first determines whether misconduct occurred, and if so whether it had a probable persuasive effect on the jury." *Ritchie v. State*, 809 N.E.2d 258, 268 (Ind.2004). "Although often phrased in terms of 'grave peril,' a claim of improper argument to the jury is measured by the probable persuasive effect of any misconduct on the jury's decision and whether there were repeated instances of misconduct which would evidence a deliberate attempt to improperly prejudice the defendant." *Id.* at 269 (citation and some quotation marks omitted).

 "It is proper for a prosecutor to argue both law and fact during final argument and propound conclusions based upon his analysis of the evidence." *Hand v. State*, 863 N.E.2d 386, 394 (Ind.Ct.App. 2007). That said, "[a] prosecutor's comments can be prejudicial if they have an impact on the jury's ability to judge the evidence fairly." *McCoy v. State*, 574 N.E.2d 304, 308 (Ind.Ct.App.1991) (citation and quotation marks omitted). As indicated by the trial court's instructions—the correctness of which Steinberg does not dispute—involuntary manslaughter does in fact "address[ ] situations where the firing of the weapon is random" and "[t]here is no specific target," as the prosecutor told the jury. Tr. at 454. *See* Appellant's App. at 521 ("A person who knowingly, or intentionally performs an act that create a substantial risk of bodily injury to another person commits criminal recklessness; A Class D felony if it is committed while armed with a deadly weapon, or a Class C felony if it is committed by shooting a firearm from a vehicle into a place where people are likely to gather."). At worst, the prosecutor gave the jury an incomplete picture of the law and did not purposefully misstate the law, as Steinberg contends.[18]

Moreover, final instructions are presumed to correct any misstatements of law made during final argument. *McCoy*, 574 N.E.2d at 308. Here, the trial court correctly instructed the jury regarding the elements of involuntary manslaughter and further explained that the jury was the judge of both the law and the facts and that the court's instructions were its best source for determining what the law is. Appellant's App. at 523. Also, in its preliminary instructions, the trial court informed the jurors that during closing arguments the attorneys would be "permitted to argue, to characterize the evidence, and to attempt to persuade you to a particular verdict. You are to accept or reject those arguments as you see fit." *Id.* at 513. Under these circumstances, we cannot conclude that the prosecutor's remarks prejudiced Steinberg.

### V. Admission of References to Legal Counsel

In the recorded jailhouse phone conversations with his parents, Steinberg blamed others for Brand's murder but expressed his desire to retain legal counsel. *See, e.g.,* Appellant's App. at 4311 ("I got some stuff to talk to a lawyer about."); *id.* at 431u ("I need to talk to a serious f* * *ing lawyer. I think."). Also, as mentioned above, Steinberg wrote a letter to Craft instructing him not to talk to anyone without Steinberg's lawyer present. Steinberg now contends that the trial court erred in admitting these references to legal counsel.[19]

---

**18.** Steinberg cites no authority for his assertion that a vehicle may be considered a "place where people are likely to gather" for purposes of criminal recklessness. We express no opinion on the validity of this assertion.

Steinberg failed to object to these references at trial, however, and he concedes that he must demonstrate fundamental error to obtain a reversal.

Our supreme court has explained that the fundamental error exception to the contemporaneous objection rule is

> extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process. The error claimed must either make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process. This exception is available only in egregious circumstances.

*Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010) (citations and quotation marks omitted).

 Assuming, without deciding, that the trial court erred in admitting the references to legal counsel, we cannot conclude that the admission of these statements constituted fundamental error. As indicated above, the State presented abundant circumstantial evidence that Steinberg murdered Brand, and Steinberg's attempt to blame Craft was undermined by his own statements that other persons were responsible for the killing. Consequently, we cannot conclude that the admission of the references to legal counsel was sufficiently egregious to warrant reversal of Steinberg's murder conviction.

### VI. Sentencing—Mental Health Considerations

As previously mentioned, Steinberg requested and received an order in limine regarding evidence that he suffered from mental illness. At the sentencing hearing, however, Steinberg's counsel referenced the mental health section of Steinberg's presentence investigation report and asked that Steinberg's mental health be considered a mitigating factor for sentencing purposes. The trial court responded to this request and sentenced Steinberg as follows:

> First of all my reading of page sixteen on the Pre–Sentence Report if we read [it] in [its] entirety indicates that Mr. Steinberg was referred to Centerstone for an assessment. There was a diagnosis made. Then in [2004] Mr. Steinberg was seen by Dr. Nagy. Who indicated that there were things going on with Mr. Steinberg. Dr. Nagy indicated that some of the things were plausible. That he had an exuberated personality style. But he was not presenting any grossly disorganized speech or though[t] patterns. He is not [e]ndorsing any hallucinations and the only question is . . . whether the things he report[s] [as] present in [his] life . . . are delusion[al] o[r] reality. He was ultimately diagnosed with having a substance related disorder, and alcohol abuse. He was referred to a brief intensive group and he failed to attend most of the session[s] and he was disruptive. It goes on to indicate that Mr. Steinberg's mother had filed for a[n] involuntar[y] mental health commitment [in late 2003]. The Appellate Court of the State of Indiana overturned the Trial Court[']s committing him involuntarily and stated in their opinion "that while the evidence was sufficient to support the finding that Steinberg suffered from a mental illness the

---

19. Steinberg also takes issue with the prosecutor's brief mention of his letter to Craft during closing argument but does not specifically assert a claim of prosecutorial misconduct. The prosecutor did not comment on Steinberg's statements to his parents regarding his desire to retain counsel.

pro[b]ate court erred in finding that Steinberg was dangerous or gravely disabled" and reversed that commitment.[20] So although I do note that there was some indication at some point in time that Mr. Steinberg was evaluated for mental illness that Dr. Nagy found that there was something going on with him but didn't diagnose him with a specific mental illness. And the Appellate Court didn't find him sufficiently gravely disable[d] or dangerous and reversed the commitment. So for the purposes of this sentencing and using mental illness as a mitigator the Court does not find that there is any such mental illness that this Court is going to use as a mitigator. The Court does find Mr. Steinberg that this particular crime is unexplainable. It is an act that is so unexplainable and so horrendous that I don't know what else there is to say. There is no reason for it, no rational[e] for it, no purpose to it. At trial the man you bought the gun from indicated that that gun was so easy that a child could use it. It didn't take particular training, it didn't take particular expertise, it didn't take particular anything. All it took was for you to choose a victim. Point a red dot and fire a gun. And I agree with the eight year old child [Brand's son] who testified in this room that it was an act of cowardice. You did nothing but purchase a gun, take that gun, get in a car, find a victim and kill him. I don't know Mr. Steinberg. I don't know whether it was an interesting experiment on your part or sport. But whatever it was there was no explanation for it. You were on probation for already having a gun, using a gun illegally. You not only violated that but you did this with intent. There was intent to purchase a gun, there was intent to use a gun, there was an intent to kill somebody. You on that early morning hours [sic] took a life and managed to destroy a whole lot of other lives. Including Mr. Steinberg your own and your family's. By one act. That I am convinced Mr. Steinberg based on the evidence that I heard at the trial I am convinced you though[t] out. I am convinced you intended. I am convinced that you planned. The actions you took after you killed Mr. Brand further indicated the intent and the plan. The words that you used to your roommate of "I messed up" were not I messed up and killed somebody were I messed up and there was a witness. That was further evidence[d] by your comment that you were concerned about the description of the car in the newspaper. And when you became convinced that the description of that car was not threatening to you, you felt slightly better about the whole thing.... In answer to his son I can not give Mr. Steinberg a hundred years. The law doesn't permit me to [do] that. But what the law does however permit me to do Mr. Steinberg is based upon the evidence that I heard in this trial and based upon your criminal record, primarily and specifically that you were on probation for not one but two crimes at the time that this crime was committed. One of them was intimidation which was dismissed, but pointing a firearm as a felony. Which the Court finds is an aggravator for this crime. What I can do Mr. Steinberg is sentence you [to] the maximum penalty under the law which is sixty-five years of incarceration in the Department of Correction[ ].

Tr. at 527–32.

▌ Steinberg now contends that the trial court erred in not finding his mental health to be a mitigating factor.

---

**20.** *In re Commitment of Steinberg,* 821 N.E.2d 385.

"We review sentencing decisions for an abuse of discretion." *Hoeppner v. State,* 918 N.E.2d 695, 698 (Ind.Ct.App.2009).[21] "A trial court may abuse its discretion by entering a sentencing statement that includes reasons for imposing a sentence not supported by the record, omits reasons clearly supported by the record, or includes reasons that are improper as a matter of law." *Id.*

▬▬▬ Determining mitigating circumstances is within the trial court's discretion. *Rogers v. State,* 878 N.E.2d 269, 272 (Ind.Ct.App.2007), *trans. denied* (2008).

> The trial court is not obligated to accept the defendant's arguments as to what constitutes a mitigating factor, and the court is not required to give the same weight to proffered mitigating factors as the defendant does. A trial court does not err in failing to find mitigation when a mitigation claim is highly disputable in nature, weight, or significance. An allegation that the trial court failed to identify or find a mitigating factor requires the defendant to establish that the mitigating evidence is both significant and clearly supported by the record.

*Id.* at 272–73 (citations and quotation marks omitted).

▬▬▬ "[I]n order for a [defendant's] mental history to provide a basis for establishing a mitigating factor, there must be a nexus between the defendant's mental health and the crime in question." *Corralez v. State,* 815 N.E.2d 1023, 1026 (Ind.Ct.

App.2004). We agree with the State that Steinberg has failed to demonstrate such a nexus. Steinberg did not present independent evidence regarding his mental health at the sentencing hearing, and he asserted only that his mental health history provided an "explanation" for Brand's murder. Tr. at 524. The evidence presented at trial indicates that Steinberg carefully plotted to kill someone without being detected and, failing that, to destroy any traces of his involvement in the crime. There is no indication that Brand's murder was motivated by any paranoia or delusion. Although it does appear that Steinberg is obsessed with nanotechnology, we agree with the State that Steinberg's attempt to pin Brand's murder on masked men involved in nanotechnology is "simply a garden-variety attempt to shift the blame by creating a story about a fictitious third party." Appellee's Br. at 35. Finally, we are unpersuaded by Steinberg's argument that the senselessness of the murder is proof positive of a link to his mental illness. As the State correctly observes, "[t]his is hardly the first case ever in which a crime was committed with no understandable motive." *Id.* In sum, we find no abuse of discretion in the trial court's rejection of Steinberg's mental health as a mitigating factor.

## VII. Sentencing—Appropriateness

▬▬ The sentencing range for murder is forty-five to sixty-five years, with the advisory (formerly presumptive) sen-

---

21. Steinberg murdered Brand several months before our legislature amended Indiana's presumptive sentencing scheme in April 2005. We have stated that "the law that was in effect at the time of the commission of the crime controls the resolution of sentencing issues." *Roush v. State,* 875 N.E.2d 801, 810 n. 6 (Ind.Ct.App.2007). It appears that neither party alerted the trial court to this issue at sentencing. On appeal, Steinberg pre-

sumes that the current advisory sentencing scheme applies. See Appellant's Br. at 30 ("Under Indiana's advisory sentencing scheme, a trial court's reasons for giving a certain sentence, and the omission of reasons arguably supported by the record, are reviewable on appeal for abuse of discretion."). Because our analysis of this issue is unaffected by the legislative amendments, we do not address the matter further.

tence being fifty-five years. Ind.Code § 35–50–2–3(a). Steinberg asks that we reduce his sixty-five-year sentence pursuant to Indiana Appellate Rule 7(B), which provides, "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." "The question under Appellate Rule 7(B) is not whether another sentence is *more* appropriate; rather, the question is whether the sentence imposed is inappropriate." *Fonner v. State*, 876 N.E.2d 340, 344 (Ind. Ct.App.2007). The defendant has the burden of persuading us that his sentence is inappropriate. *Id.*[22]

■ Steinberg properly concedes that the nature of this offense is "tragic." Appellant's Br. at 35. Brand's murder was not a crime of passion or revenge but merely the culmination of Steinberg's elaborate plan to kill someone without being detected. Steinberg purchased a semiautomatic rifle with a laser sight, a flash suppressor, and high-velocity ammunition and equipped his vehicle with oxyacetylene welding tanks that he could use to destroy the weapon "if anything ever happened." Tr. at 137. He drove alongside his apparently random victim on a nearly deserted highway in the middle of the night and shot him in the head at close range. Police never recovered Steinberg's rifle and welding tanks but did find molten metal fragments in Steinberg's SUV. Steinberg's premeditated and utterly senseless

murder of Brand deserves a lengthy sentence.

With respect to his character, Steinberg again focuses on his mental health history. He received a preliminary diagnosis of schizophrenia in late 2003, but a psychiatrist who evaluated him in August 2004 "found little evidence of psychosis or delusional disorder." Appellant's App. at 623. Steinberg "was ultimately diagnosed as having 'other (or unknown) substance-related disorder and alcohol abuse.' " *Id.* He was referred to group therapy, was removed for " 'poor attendance and disruptive attitude,' " and then failed to complete individual therapy. *Id.* When interviewed for the presentence investigation report, Steinberg "classified himself as being between a moderate and heavy drinker who plans to make no changes in regard to his alcohol consumption." *Id.* at 624. In sum, the evidence regarding the nature and severity of Steinberg's mental illness is conflicting, and his refusal to deal with his substance abuse issues reflects unfavorably on his character.

Also, at the time of sentencing, the thirty-year-old Steinberg had numerous arrests and several misdemeanor convictions for substance- and driving-related offenses (including marijuana possession and operating while intoxicated), misdemeanor convictions for disorderly conduct and resisting law enforcement, as well as a class D felony conviction for pointing a firearm. Steinberg was on probation for the firearm offense when he purchased the AR–15 and murdered Brand. While incarcerated

---

**22.** Steinberg asserts that "[m]aximum sentences should be reserved for the 'very worst offenses and offenders.' " Appellant's Br. at 35 (quoting *Buchanan v. State*, 699 N.E.2d 655, 657 (Ind.1998)). We have often stated that

[i]f we were to take this language literally, we would reserve the maximum punishment for only the single most heinous of-

fense.... We should concentrate less on comparing the facts of this case to others, whether real or hypothetical, and more on focusing on the nature, extent, and depravity of the offense for which the defendant is being sentenced, and what it reveals about the defendant's character.

*Brown v. State*, 760 N.E.2d 243, 247 (Ind.Ct. App.2002), *trans. denied.*

pending trial, Steinberg was found to have committed four conduct violations, including filing down and sharpening a stool seat, trafficking, and destroying property. Steinberg's numerous and increasingly serious encounters with the law, as well as his failure to comply with the conditions of his probation and incarceration, paint an unflattering portrait of his character. All in all, Steinberg has failed to persuade us that his sentence is inappropriate.

Affirmed.

FRIEDLANDER, J., and BARNES, J., concur.