## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 12 2019, 6:21 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Valerie K. Boots
Ellen M. O'Connor
Marion County Public Defender Agency
– Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Elijah Z. Harris,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

June 12, 2019

Court of Appeals Case No.
18A-CR-779

Appeal from the Marion Superior Court

The Honorable Lisa F. Borges, Judge

Trial Court Cause No.
49G04-1610-MR-42335

**Mathias, Judge.**

[1] Elijah Z. Harris ("Harris") was convicted in the Marion Superior Court of felony murder.[1] Harris now appeals raising the following issue: whether the trial court abused its discretion when it admitted, over Harris's objection, a telephone call Harris made from jail.

[2] We affirm.

## Facts and Procedural History

[3] Eighteen-year-old Shanaya Brown ("Brown"), also known as Koko, and fifteen-year-old Tyson Berry ("Berry") were close friends who often hung out, played basketball, and smoked marijuana almost daily at an apartment complex on the east side of Indianapolis. Harris and Berry are cousins, and they both lived with Berry's aunt at Keystone and 11th Street. Malakai Harris ("Malakai"), another cousin, also stayed at Berry's aunt's house on occasion and was good friends with Jamel Perkins ("Perkins").

[4] On the afternoon of September 12, 2016, Brown and Berry made plans to smoke marijuana together. Berry, Harris, and Malakai met at Berry's aunt's house and Perkins arrived later. Malakai drove a tan GMC Yukon, and Berry caught a ride with Malakai that afternoon to the New Bridge Apartment complex, where Brown lived. Perkins and Harris were also in the SUV. Berry called Brown and said he "needed to find a lick."[2] Tr. Vol. II, p. 143. As they

---

[1] *See* Ind. Code § 35-42-1-1.

[2] A "lick" is slang for robbery. Tr. Vol. II p. 237.

arrived at Brown's apartment, Berry talked about "getting a blunt." *Id.* at 152. Berry knew a marijuana dealer by the name of Christopher Dullen ("Dullen"), who lived in the same apartment complex as Brown. Berry had purchased marijuana from Dullen on three to four occasions prior.

[5] Berry told Brown to enter the SUV. Malakai was driving, Perkins was in the passenger seat, and Harris was seated in the second row. They drove to Dullen's residence, and Berry exited the SUV, walked to Dullen's residence and knocked on the door. Dullen answered the door with a gun in his hand and let Berry in. Dullen went to the kitchen cabinet to get the marijuana. Dullen pulled out a big, clear plastic bag of marijuana that was half full, and Berry noticed about $1,200 inside the cabinet. Tr. Vol. III, pp. 156–158. Berry purchased marijuana from Dullen and returned to the SUV. Berry told the group that Dullen had money and marijuana in the cabinet, and that Dullen was carrying a gun. Both Perkins and Berry had a gun on their person. Brown showed the group a cellphone photo from Dullen's Facebook profile, showing Dullen flashing his money. Tr. Vol. III, p. 206. Malakai drove away from Dullen's residence and parked outside the entrance of the apartment complex. The group then made a plan to rob Dullen.

[6] Perkins informed the group that they would have to act together in order to pull off the robbery, and everyone in the SUV agreed to the plan. They agreed that Berry and Perkins would knock on Dullen's door, and Berry would tell Dullen that Perkins wanted to purchase marijuana. Tr. Vol. III, pp. 162–63. The two would leave the door open behind them, and Malakai would enter and commit

the robbery. *Id.* at 163. Harris was driving Malakai's SUV, and Brown was going to be the lookout. *Id.* at 164. The group was going to meet by the entrance to the complex when the robbery was done. Tr. Vol. II, pp. 162–63; Tr. Vol. III, pp. 3–4.

[7] Brown exited the vehicle and returned to her mother's apartment, where she stood on the porch as a lookout. Berry, Perkins, and Malakai exited the SUV and walked toward Dullen's residence. Berry and Perkins knocked on Dullen's door, while Malakai went to the side of the house. Harris drove off. Dullen opened the door with his gun in his hand, and Berry told Dullen his "homie" was "trying to buy some weed." Tr. Vol. III, p. 167. Dullen put his gun back in his pocket and went to the cabinet to get the marijuana. Perkins pulled his gun out and pointed it at Dullen and told him to "come off everything." *Id.* at 168. Dullen reached for his gun, and Perkins told Dullen three times not to reach for his gun. Perkins shot Dullen three times near the chest area, and Dullen attempted to retrieve his gun once again. At this point, Perkins shot Dullen two more times. Berry grabbed Dullen's gun, and Perkins grabbed the money and marijuana from the cabinet.

[8] Brown, who had heard the gun shots, saw Berry and Perkins run out of Dullen's residence toward the entrance of the complex. A neighbor also heard the gun shots, called 911, and reported two men fleeing the scene. *Id.* at 113–114. Harris returned to the complex entrance to pick up the group, and they all got in the SUV. Inside the car, Berry pulled out Dullen's gun, and Perkins had a gun as well. *Id.* at 176. Brown asked Berry if Dullen was dead. Harris then

drove to Berry's aunt's house, and everyone in the SUV went upstairs to Harris's bedroom. Berry had blood on his hands and his shirt, and Perkins gestured that he shot Dullen three times in the chest area and was likely dead. *Id.* at 170, 176–178.

[9] Harris divided the marijuana into piles using a digital scale in his room and split the marijuana among everyone. Harris received some money and marijuana.

[10] Officers were dispatched to the scene and saw the victim lying on the ground, unresponsive. The medics determined that Dullen was deceased and had suffered eight gunshot wounds. The shell casings found at the scene were .45 caliber Federal brand ammunition.

[11] The following day, Brown called the police and requested to talk with a detective about "some stuff [that] just happened." Tr. Vol. III, p. 24. Detective Gary Smith ("Detective Smith") of Indianapolis Metro Police Department contacted Brown. Brown told Detective Smith that she was friends with Berry and that the other men involved in the crime were Berry's cousins. Brown took Detective Smith to Berry's aunt's house, and Harris was there at the residence. In Harris's bedroom, Detective Smith found .45 caliber ammunition and a digital scale. The ammunition box held fifty bullets, and there were forty-one bullets inside the box. Subsequently, Brown identified Perkins, Harris, and Malakai from photo lineups. *Id.* at 41–42; Tr. Vol. IV, p. 154–55, 158–60; Ex.

Vol., State's Exs. 19–21. Berry talked to the police as well and gave first-hand testimony as to what took place and pleaded guilty to Level 2 felony robbery.[3]

[12] On the day in question, Harris wore an ankle monitor, and the device records show that Harris was at the New Bridge Apartments during the time of the incident. Tr. Vol. II, 191–92. Video surveillance also confirmed that a GMC Yukon was present in the area during the duration of the incident, and three men were also seen running toward the Yukon to get in as it drove off. Tr. Vol. IV, pp. 99–101.

[13] On October 27, 2016, the State charged Harris with Count I, felony murder and Count II, robbery resulting in serious bodily injury. On July 31, 2017, the State amended the information to allege that Harris was an habitual offender.

[14] On November 1, 2016, Harris made a telephone call from the Marion County Jail. Tr. Vol. IV, p. 240; Ex. Vol., State's Exs. 105, 105A. At the beginning of each call, there is an announcement advising that the call is being made from a correctional facility and that the telephone call is subject to monitoring and recording. *Id.* During the phone call, Harris said the following:

> "Check out where Koko [Brown] at, man. You know what I mean?" [....] See where you know what I'm saying, Koko [Brown] at. Know what I'm sayin? Holla at her, Koko [Brown],

---

[3] Berry was initially charged as a juvenile but agreed to be waived into adult court as part of his plea agreement. Tr. Vol. III, 192. Berry received a 17 1/2-year sentence in exchange for his testimony. *Id.*

you know what I mean ... shit ... That'd be the end of that. You know what I mean?"

Ex. Vol., State's Ex. 106.

[15] Sergeant Jay Stundich ("Sergeant Stundich") is the keeper of records for the inmate call records of the Marion County Sheriff's office. On July 10, 2017, Sergeant Stundich listened to the call and verified the call was made by Harris on November 1, 2016. Tr. Vol. IV, p. 240.

[16] At a pretrial hearing on January 8, 2018, the State filed a motion *in limine* to admit the audio and transcript of a telephone call Harris made from jail. Harris objected to the State's motion on relevancy grounds, arguing that the conversation was vague and confusing and therefore, not relevant. The State argued it was relevant because Harris and Brown had met for the first time during the date of the incident. The trial court allowed the jail call to be admitted over Harris's objection, concluding that the conversation about reaching out to a witness was relevant and that it would be up to the jury to decide what weight to give the evidence. Tr. Vol. II, pp. 9–20.

[17] A three-day jury trial commenced on January 9, 2018. During trial, the recorded jail call was played for the jury. Harris once again renewed his objection at trial to the jail call on grounds of relevance and vagueness. Tr. Vol. IV, p. 240–241.

[18] The jury found Harris guilty as charged. Harris waived jury trial for the habitual offender count. By a bench trial on February 7, 2018, the court found Harris to

be a habitual offender. On March 14, 2018, Harris was sentenced to fifty-five years for Count I, felony murder, and Count I was enhanced by twenty years. The trial court vacated Count II robbery resulting in serious bodily injury by operation of double jeopardy. Thus, Harris's aggregate sentence was seventy-five years of incarceration at the Indiana Department of Correction. Harris now appeals.

## Discussion and Decision

Harris contends that the trial court abused its discretion when it admitted into evidence the recording of the phone call he made from jail. A trial court has broad discretion in ruling on the admissibility of evidence. *Packer v. State*, 800 N.E.2d 574, 578 (Ind. Ct. App. 2003), *trans. denied*. We will reverse a trial court's ruling on the admissibility of evidence only when the trial court abused its discretion. *Id.* An abuse of discretion occurs when a decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Id.* We may affirm a trial court's admissibility ruling on any theory supported by the record. *Steinberg v. State*, 941 N.E.2d 515, 522 (Ind. Ct. App. 2011), *trans. denied.*

On appeal, Harris claims that the trial court abused its discretion when it admitted the phone call from jail because it was "difficult to completely understand the meaning and context of the call due to the use of slang and nicknames . . . employed." Appellant's Br. at 12. Harris argues that the call did

not specifically reference the murder and had the potential to confuse and prejudice the jury. We disagree.

[21] Here, Sergeant Stundich listened to the call and identified Harris as the person that made the call on November 1, 2016. Tr. Vol. IV, p. 240. The call was made four days after Harris's arrest on charges of felony murder and robbery resulting in serious bodily injury. The day after the homicide, Brown cooperated with the police and helped identify Harris, Perkins, and Malakai as the ones involved in the homicide. The call references Brown twice, and Harris asks about Brown's whereabouts. Ex. Vol., State's Ex. 106. Additionally, Brown and Harris met for the first time during the day of the incident, and therefore, it was logical under the circumstances for the court to allow the jury to consider if Harris was calling in relation to the murder. The record supports the trial court's ruling as Brown was a key witness for the State in this case and provided testimony that is critical to the prosecution of Harris. In addition to Brown's testimony, Berry also testified that after he moved back to Ohio in February of 2017, Harris asked him where Brown was staying. Tr. Vol. III, p. 185. The phone call is relevant, and we conclude that Harris's recorded phone call was properly admitted into evidence.

[22] Furthermore, even if, as Harris claims, it was an error to admit the recorded phone call conversation, any error was harmless. Errors in the admission or exclusion of evidence are to be disregarded as harmless unless they affect the substantial rights of a party. *King v. State*, 985 N.E.2d 755, 757 (Ind. Ct. App. 2013) (citing Ind. Trial Rule 61), *trans. denied.* "The improper admission of

evidence is harmless error when the conviction is supported by substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction." *Steinberg*, 941 N.E.2d at 527 (quoting *Cook v. State*, 734 N.E.2d 563, 569 (Ind. 2000)).

[23] When reviewing a claim of insufficient evidence to sustain a conviction, we consider only the probative evidence and reasonable inferences supporting the verdict. *Jackson v. State*, 50 N.E.3d 767, 770 (Ind. 2016). It is the fact-finder's role, not ours, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. *Id.* We will affirm the conviction unless no reasonable fact-finder could have found the elements of the crime proven beyond a reasonable doubt. *Id.* It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence; rather, the evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Drane v. State,* 867 N.E.2d 144, 146–47 (Ind. 2007). Although Harris suggests that without the recorded call there was "insufficient evidence to sustain Harris's felony murder conviction," the record provides otherwise.

[24] Here, the State's key witness Brown provided testimony that Harris was the driver of the SUV and agreed to rob Dullen.[4] Harris was present in the SUV when the group planned the robbery after Brown shared Facebook photos of

---

[4] Under the accomplice liability statute, a person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense. *Ellis v. State*, 67 N.E.3d 643, 649 (Ind. 2017); Ind. Code § 35-41-2-4.

Dullen flashing his money. Harris clearly knew a robbery was being planned. Further, when Perkins was designating roles to the group for the robbery, Harris's role was to be the driver, and Harris did just that. Harris picked up the group after the robbery was complete and was aware that Dullen had been shot. Harris received a "little money" for doing his part in the robbery and split the marijuana obtained from the robbery among the group. Additionally, the State introduced into evidence data from a GPS tracker that Harris wore around his ankle, and the State's witness, Bruce Derrick, testified that the data confirmed Harris's presence at the New Bridge Apartment complex during the time that the robbery and murder took place. Video surveillance also placed Harris at the scene. Detective Smith later obtained a warrant and searched Harris's bedroom, where he found forty-one bullets in an ammunition box that held fifty bullets. The coroner had found eight bullets in Dullen's body during the autopsy. The bullets found in the apartment and during the autopsy were the same .45 caliber Federal brand ammunition.

[25] Although Harris argued at trial that Brown's and Berry's testimonies were contradicting and incredible, it was for the jury to assess witness credibility. Berry's testimony regarding Harris's inquiry about Brown's whereabouts lends support that the call Harris made to Berry shortly after Harris's arrest was in relation to Dullen's murder. That phone call was properly admissible, based on the standard warning a jailed individual receives when (s)he places a call from

the jail. In addition, the call was cumulative of other independent evidence of guilt. Harris's conviction was supported by independent evidence of guilt. [5]

[26]    Affirmed.

May, J., and Brown, J., concur.

---

[5] The evidence discussed above is sufficient to convict Harris for purposes of accomplice liability. *See Bruno v. State,* 774 N.E.2d 880, 882 (Ind. 2002).