## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 17 2016, 8:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Clay M. Patton
Osan & Patton, LLP
Valparaiso, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Larry Shawn Martin, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | June 17, 2016 <br><br> Court of Appeals Case No. <br> 64A05-1511-CR-1907 <br><br> Appeal from the Porter Superior Court. <br> The Honorable Roger V. Bradford, Judge. <br> Cause No. 64D01-1309-FA-8687 |

**Sharpnack, Senior Judge**

## Statement of the Case

Following a jury trial, Larry Shawn Martin was convicted of five counts of Class A felony child molesting.[1] He was sentenced to forty-eight years in the Indiana Department of Correction for each count, with the sentences to be served concurrently. He appeals the sentence and challenges the sufficiency of the evidence to support his convictions. We affirm.

## Issues

Martin presents the following restated issues for our review:

> I. Whether the State presented sufficient evidence to sustain his convictions;
>
> II. Whether the trial court abused its discretion when it sentenced him; and
>
> III. Whether his sentence is inappropriate in light of the nature of his offenses and his character.

## Facts and Procedural History

The victim, K.H., is the daughter of Eleena Haag (n/k/a Eleena Escalante). In October 2012, Eleena and Martin began dating. Shortly thereafter, Eleena, K.H., and S.H. (Eleena's son and K.H.'s younger brother) moved in with

---

[1] Ind. Code § 35-42-4-3(a)(1) (2007).

Martin. They first lived in an RV camper located on the property of Martin's employer, but soon moved to a house in Hebron, Indiana (the Hebron house), shortly before Halloween.

[4] Eleena and Martin's relationship deteriorated, and Eleena and her children moved from the Hebron house a few days before Christmas 2012. Eleena and her children moved to an apartment in Valparaiso, Indiana. She enrolled K.H. in school on January 7, 2013. K.H. was in the 7th grade. Eleena told the school counselor that K.H. was not to have access to the internet "because there were some concerns with regard to communication that [K.H.] might have with someone." Tr. p. 331. At some point, Eleena obtained a no contact order against Martin that covered Eleena and her children. The school counselor was aware of the order.

[5] The school counselor began meeting with K.H. approximately weekly regarding various matters. During the meetings, K.H. would discuss an adult man she identified "as her mom's ex-boyfriend." *Id*. at 333. The adult man was Martin. The counselor "became concerned that [K.H.] seemed . . . very attached to him and missed him very much." *Id*. According to the counselor, "a lot of the ways [K.H.] talked about [Martin] sounded more like a boyfriend/girlfriend type relationship than a father figure." *Id*. One of K.H.'s teachers provided the counselor with a hand-written note from K.H. wherein K.H. professed her love for Martin. On January 30, 2013, the school counselor

met with Eleena about the relationship between K.H. and Martin. Eleena then spoke with K.H. about the matter and instructed K.H. not to talk to Martin.

[6] K.H. and S.H.'s father, John Haag, lived with his girlfriend, Thora Vitalone, and his friend, Kevin Keesler, in Keesler's home in South Haven (Porter County), Indiana. Between October 2012 and March 2013, K.H. and S.H. enjoyed overnight visits with their father approximately twice a month. On one occasion, while K.H. was visiting, Vitalone noticed that K.H. was communicating with someone on Facebook. Vitalone saw parts of the conversation and testified to seeing the following on the laptop screen: "I miss you. I try to be with you. . . . How have you been? . . . Oh, I wish [I] was there, too." *Id*. at 361-62. This information was relayed to Eleena. Eleena assumed K.H. was communicating with Martin, and she, again, instructed K.H. not to communicate with Martin.

[7] On March 2, 2013, Robin Shultman (n/k/a Robin Bilbrey), Martin's ex-wife, received a picture by text message from Martin. Martin told Shultman the picture was of K.H.'s buttocks, while wearing underwear. Shultman sent the picture to Eleena and Eleena confronted K.H. about the picture. K.H. explained that she sent Martin the picture "[b]ecause he asked [her] to send him one." *Id*. at 230. K.H. then began crying and told her mother that Martin was having sex with her and that "[Martin] had done horrible things to her." *Id*. at 298.

[8] Eleena contacted the Valparaiso Police Department, and she and K.H. travelled to the police station to report the sexual contact between K.H. and Martin. K.H. reported that sometime in November 2012, at the Hebron house, Martin asked K.H. to come down into the basement and help him install a washer and dryer. K.H.'s brother, S.H., and Martin's son from another relationship, S., remained upstairs in one of the bedrooms. While in the basement, Martin removed K.H.'s clothes, bent her over, "put his wiener in [her] vagina," covered her mouth, and had sexual intercourse with her. *Id*. at 185. K.H. testified that Martin told her not to tell anyone about the incident or "he would hurt [K.H.] and [her] family." *Id*. at 186. While K.H. resided in the Hebron house, Martin had sexual intercourse with K.H. "either every day or every other day; sometimes more than one time a day." *Id*. at 191. The encounters occurred in the basement, the dining room, the hallway, the living room, the garage, and the bathroom. K.H. testified that during the encounters, Martin would sometimes have her sit on top of him and he would move her underwear to the side to have intercourse with her. K.H. testified that Martin has a tattoo on his penis that reads, "Your Name." *Id*. at 200.

[9] Martin also had sex with K.H. when they drove places in his car. He would either have K.H. sit on top of him while he drove or he would pull his vehicle to the side of the road and have sex with K.H. outside of the vehicle. K.H.

indicated at trial that Martin had sex with her approximately eighty to ninety times while she lived at the Hebron house. *Id*. at 253.

[10] Martin also had sex with K.H. when K.H. was visiting her father in South Haven. Martin would communicate with K.H. via Facebook and tell her when he wanted to meet with her. One night, Martin told K.H. he wanted to see her, and a short time later K.H. walked out of the South Haven house to Martin's car, which was parked in the driveway. Martin had sex with K.H. near the car. On other occasions, Martin would have sex with K.H. in the middle of the night in the South Haven house garage and behind a shed located in the backyard of the South Haven house. On one particular occasion, Martin and K.H. walked to his car, which was parked in the lot of a nearby apartment complex, and Martin had sex with K.H. in the backseat of his car.

[11] K.H. testified that in total Martin had sex with her over 100 times between November 2012 and February 2013. At the time of the encounters, K.H. was thirteen years old and Martin was thirty-eight years old.

[12] On September 30, 2013, Martin was charged with five counts of Class A felony child molesting. Following a jury trial, he was found guilty as charged. On October 6, 2015, Martin was sentenced to forty-eight years for each of the counts, with the sentences to be served concurrently. At sentencing, the trial court stated:

In looking at the sentence to impose, the Court is required to start with the advisory sentence of 30 years, look at aggravating and mitigating circumstances. The Court finds, as an aggravating circumstance, the Defendant's history of criminal behavior and the fact that he was on parole at the time these offenses were committed. I specifically do not find the position of trust aggravator because I don't think it applies in this case.

The Court finds no mitigating circumstances. The reference to mental health problems in the presentence report is just the Defendant alleges that, [sic] there's no information on diagnosis or treatment or anything else; so, I specifically do not find any mitigating circumstances.

Based on the aggravating circumstances outweighing the mitigating, the Court is going to add 18 years to the 30-year advisory sentence, for a total of 48 years in the Indiana Department of Correction on each count. I think that although the Court could run these consecutive, this is just one long episode of the same conduct. The cases cited by [defense counsel] are on point on this so I'm going to order the five sentences to run concurrently. So, the total sentence will be 48 years with none suspended. That will be served consecutive to the [sic] whatever sentence ultimately is imposed on the parole violation, [sic] we're not quite sure what that is, but that will come first, and then the sentence would get started.

Sentencing Tr. pp. 15-16.

# Discussion and Decision

## I. Sufficiency of Evidence

[13] Martin maintains there was insufficient evidence to support his convictions. When reviewing the sufficiency of evidence to support a conviction, we consider only the probative evidence and reasonable inferences supporting the trial court's decision. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). It is the factfinder's role, and not ours, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. *Id.* To preserve this structure, when we are confronted with conflicting evidence, we consider it most favorably to the trial court's ruling. *Id.* We affirm a conviction unless no reasonable factfinder could find the elements of the crime proven beyond a reasonable doubt. *Id.* It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence; rather, the evidence is sufficient if an inference reasonably may be drawn from it to support the trial court's decision. *Id.* at 147.

[14] Martin invokes the "incredible dubiosity rule" under which we may impinge on the jury's responsibility to judge the credibility of the witness only when it has confronted "'inherently improbable' testimony . . . or coerced, equivocal, wholly uncorroborated testimony of 'incredible dubiosity.'" *Rodgers v. State*, 422 N.E.2d 1211, 1213 (Ind. 1981) (citations omitted). We may reverse a conviction if the sole witness presents inherently improbable testimony and

there is no circumstantial evidence of the defendant's guilt. *White v. State*, 706 N.E.2d 1078, 1079 (Ind. 1999). Application of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it. *Stephenson v. State*, 742 N.E.2d 463, 498 (Ind. 2001) (citations omitted), *cert. denied*.

[15] Martin maintains K.H. presented inconsistent testimony at trial and testimony that was inherently improbable. Specifically, Martin argues: (1) K.H. did not testify clearly to when Martin first engaged in sexual intercourse with her and when Martin last had sexual intercourse with her; (2) there were inconsistencies in K.H.'s testimony regarding whether Martin placed his hand over her mouth when he engaged her in sex in the basement of the Hebron house; (3) K.H. recanted statements allegedly made to Martin that Eleena was beating K.H.; (4) her testimony that there were at least 100 sexual encounters with Martin was improbable because K.H. lived in the Hebron house for only eight weeks and she spent even fewer days at her father's residence in South Haven; (5) her testimony regarding the sexual encounter that occurred while Martin was driving was "incredible" (Appellant's Br. p. 10); and (6) when Martin informed K.H. that Eleena was making allegations that Martin touched K.H., K.H.'s reaction was one of shock and surprise.

[16] Martin's arguments do not persuade us that K.H.'s testimony was inherently improbable. We acknowledge that K.H.'s testimony concerning dates when

Martin first and last had sex with her was unclear, that there were inconsistencies regarding whether Martin had his hand over K.H.'s mouth when he engaged her in sex, and that she denied telling Martin her mother was beating her. However, "[t]he fact that a witness gives trial testimony that contradicts earlier pre-trial statements does not necessarily render the trial testimony incredibly dubious." *Murray v. State*, 761 N.E.2d 406, 409 (Ind. 2002). Furthermore, it is the province of the jury to weigh the evidence and resolve inconsistencies. *See Johnson v. State*, 671 N.E.2d 1203, 1209 (Ind. Ct. App. 1996) (it is the jury's province to resolve any inconsistencies in the evidence), *trans. denied*. The jury found K.H.'s testimony to be credible.

[17] Regarding the number of sexual encounters and how they occurred, and K.H.'s reaction to learning her mother made allegations against Martin, the jury heard the evidence, weighed the evidence, and judged the credibility of the witnesses. Martin was convicted as charged. This Court cannot reweigh this evidence or question the credibility of witnesses. *Weis v. State*, 825 N.E.2d 896, 905 (Ind. Ct. App. 2005).

[18] Martin further argues K.H.'s "story" is "utterly impossible to believe." Appellant's Br. p. 12. His specific argument seems to be that it is unlikely that the sexual encounters could have occurred in the Hebron house because it was

a 1,000 square foot house and four adults and three children lived in the house.[2] Martin also questions K.H.'s testimony that he engaged in sex with her every day while living in the Hebron house, implying that he would have been too tired to engage in such activity because he was nearly forty years old; he worked a ten-hour workday that required physical labor; and, he and Eleena were engaging in sex every day.

[19]    K.H.'s testimony was not incredibly dubious. K.H. testified in detail regarding multiple incidents during which Martin forced her to engage in sexual intercourse with him. She testified that if other individuals were in the Hebron house when Martin wanted to engage in sex, he would have sex with her in isolated areas of the house, such as the basement or the garage. K.H. testified to a tattoo that Martin has on his penis. Eleena confirmed the presence of the tattoo when she testified at trial. Other witnesses corroborated K.H.'s testimony regarding Martin's attempts to visit her for sex. For example, K.H. testified that Martin rode a bike to her father's residence in South Haven and parked the bike in the driveway so that K.H.'s father would not hear Martin's vehicle. At trial, K.H.'s father testified he saw a bike parked in his driveway

---

[2] Carrie Kuehl (a friend of Eleena and Martin) and her young son also lived in the house, along with Martin's adult son Kyle Ehlers. Martin's young son, S., lived in an adjacent apartment complex and would visit the Hebron house.

one night; he was unable to locate K.H. inside or outside of the house; K.H. eventually came out from behind the shed located in the backyard; and, he heard movement coming from near the fence that enclosed the backyard.

[20] Circumstantial evidence was presented to support K.H.'s allegations. Evidence was presented at trial indicating Martin had an improper relationship with K.H. Several witnesses testified that Martin and K.H. seemed to have a relationship akin to that of boyfriend and girlfriend. In their communications via Facebook, Martin and K.H. used the word "love" approximately ninety times. There were subjects that Martin told K.H. not to discuss when communicating with him via Facebook, such as "sex or pregnancy tests or panties." Tr. p. 228. K.H. was asked why she could not discuss these subjects and she testified at trial, "Because it would be easier to get caught." *Id.* Martin insisted that K.H. provide a password when communicating with him on Facebook to ensure that he did not unwittingly discuss matters with someone other than K.H.

[21] We do not find any of K.H.'s testimony to be inherently improbable, contradictory, or equivocal. Martin's arguments are an invitation to reweigh the evidence and judge the credibility of the witness, which we cannot do. *See Drane*, 867 N.E.2d at 146. The jury believed K.H.'s testimony. Martin has not shown her testimony was so inherently improbable that no reasonable trier of fact could believe it, and there is probative evidence from which the jury could

have found Martin guilty beyond a reasonable doubt. We affirm his convictions.

## II. Challenge to Sentence

[22] Martin contends that his forty-eight year sentence is inappropriate in light of the nature of the offense and his character. Martin also contends the trial court abused its discretion at sentencing because it failed to consider all of the mitigating circumstances Martin presented at his sentencing hearing. Martin blends his inappropriateness argument with his abuse of discretion argument. It is well settled that inappropriate sentence claims and abuse of discretion claims are to be analyzed separately. *See King v. State*, 894 N.E.2d 265, 266 (Ind. Ct. App. 2008).

### A. Abuse of Discretion

[23] Martin argues the trial court abused its discretion when it sentenced him to forty-eight years. He maintains the trial court's failure to find mitigating circumstances "[that were] clearly supported by the record[] gives rise to the belief . . . the trial court . . . did not [properly] consider the same." Appellant's Br. p. 14.

[24] Sentencing decisions rest within the sound discretion of the trial court and will be disturbed only on a showing of abuse of discretion. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g,* 875 N.E.2d 218 (Ind. 2007). An

abuse of discretion occurs when the decision is clearly against the logic and effect of the evidence before the court or the reasonable inferences to be drawn therefrom. *Id*. A trial court abuses its discretion if it: (1) fails to enter a sentencing statement; (2) enters "a sentencing statement that explains reasons for imposing a sentence – including a finding of aggravating and mitigating factors if any – but the record does not support the reasons;" (3) enters a sentencing statement that "omits reasons that are clearly supported by the record and advanced for consideration;" or (4) considers reasons that "are improper as a matter of law." *Id*. at 490-91.

[25] A trial court is not obligated to accept a defendant's claim as to what constitutes a mitigating circumstance. *Rascoe v. State*, 736 N.E.2d 246, 249 (Ind. 2000). A claim that the trial court failed to find a mitigating circumstance requires the defendant to establish that the mitigating evidence is both significant and clearly supported by the record. *Anglemyer*, 868 N.E.2d at 493. "'If the trial court does not find the existence of a mitigating factor after it has been argued by counsel, the trial court is not obligated to explain why it has found that the factor does not exist.'" *Id*. (quoting *Fugate v. State*, 608 N.E.2d 1370, 1374 (Ind. 1993)).

[26] At sentencing, Martin presented the following as mitigating circumstances: Martin's father was the victim of murder, Martin's mental health issues of bipolar disorder and schizophrenia, and the fact that Martin has not previously

been convicted of a sex crime. Defense counsel presented the following argument to the trial court at the sentencing hearing:

> I would suggest to the Court as far as mitigators for Mr. Martin, as was news to me and I believe [the prosecutor] as well, I think the fact that the Defendant's father was murdered while he – while this Defendant was incarcerated the last time should be viewed as a mitigator. He obviously did not have a chance, albeit by his own actions, to be with his father. But I think that can certainly have a negative effect on any person to have a parent murdered.
>
> Additionally, the [presentence investigation report] indicates that the Defendant suffers from bipolar disorder and schizophrenia as well, and I would suggest to the Court that that also be considered by this Court as a mitigator.
>
> . . .
>
> In looking at the – Mr. Martin's [presentence investigation report], his offenses largely have to [sic] deal with theft and drugs; this is the first ever sexual allegation offense/conviction for Mr. Martin.

[27]    Sentencing Tr. pp. 13-14. In making its sentencing determination, the trial court referenced Martin's mental health problems, but found Martin presented "no information on diagnosis or treatment or anything else." *Id.* at 15. The trial court then stated it "specifically [did] not find any mitigating circumstances." *Id.*

As noted by the trial court, Martin presented no evidence at sentencing regarding his mental health problems. To establish mental health issues as a mitigating circumstance, the defendant must show a nexus between the mental health and the crime in question. *Weedman v. State*, 21 N.E.3d 873, 894 (Ind. Ct. App. 2014) (citing *Steinberg v. State*, 941 N.E.2d 515, 534 (Ind. Ct. App. 2011), *trans. denied*). Martin also presented no evidence regarding how the murder of his father affected him.

The trial court found as aggravating circumstances Martin's criminal history and the fact that he was on parole at the time the offenses were committed. But the court specifically found no mitigating circumstances. The trial court was not obligated to explain why it did not find a factor to be significantly mitigating, and it was not required to agree with Martin's assessment as to the weight or value to be given to a mitigating factor. *See Creekmore v. State*, 853 N.E.2d 523, 530 (Ind. Ct. App. 2006), *clarified on denial of reh'g*, 858 N.E.2d 230 (Ind. Ct. App. 2006). We find no error.

### B. *Appropriateness of Martin's Sentence*

Martin next contends in light of the nature of his offenses and his character, his "near-maximum sentence of [forty-eight years] is inappropriate." Appellant's Br. p. 15. This Court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] the sentence is inappropriate in light of the nature of the offense and the character of the

offender." Ind. Appellate Rule 7(B). "We must and should exercise deference to a trial court's sentencing decision, both because Rule 7(B) requires us to give 'due consideration' to that decision and because we understand and recognize the unique perspective a trial court brings to its sentencing decisions." *Stewart v. State,* 866 N.E.2d 858, 866 (Ind. Ct. App. 2007). A defendant bears the burden of persuading the appellate court that his sentence has met the inappropriateness standard of review. *Anglemyer*, 868 N.E.2d at 494.

[31] According to Martin, the nature of his offenses is outside of his "criminal character;" thus, the forty-eight-year sentence is inappropriate. Appellant's Br. p. 15. Martin argues his offenses are "wholly outside the realm of [his] prior . . . criminal history" which includes "drug [dealing]/[drug] user and thief, not [child molesting];" the current offenses are "[his] first convictions (and even allegations) of any type of sex crime and/or crime of violence;" and the pre-sentence investigation report recommended a sentence of forty years. *Id*.

[32] We first look to the statutory range established for the class of the offenses. Martin was convicted of five Class A felonies. The statutory range for a Class A felony was between twenty and fifty years, with the advisory sentence being thirty years. Ind. Code § 35-50-2-4 (2005). Martin received concurrent forty-eight-year terms. The trial court's sentence was entirely within the range allowed by statute. The court noted it could have ordered the sentence for each

count served consecutively, but ultimately determined the sentences should be served concurrently.

[33] We next look to the nature of the offenses and Martin's character. As to the nature of Martin's offenses, evidence was presented indicating Martin engaged in sex with thirteen-year-old K.H. "too many times to count" within the span of approximately three months. Appellant's App., Vol. I, p. 14. He indicated that he would hurt her and her family if she told anyone about the sexual encounters. He communicated with her secretly on Facebook and manipulated her into believing she and Martin had a "boyfriend/girlfriend" relationship. He asked K.H. to send him a picture of her buttocks. Even after a no contact order was served on Martin, Martin continued to communicate with K.H.

[34] As to Martin's character, he has a criminal history that began when he was a juvenile and continues to present. He has been convicted of Class B felony delivery of a schedule I controlled substance, Class B felony burglary, Class C felony burglary, and Class D felony receiving stolen property. Martin was on parole when he committed the instant offenses. Additionally, the frequency of the molestations, Martin's manipulation of K.H., his threats against K.H., and the measures he took to keep his improper relationship with K.H. secret show his poor character. Martin has not met his burden of persuading us that his sentence is inappropriate in light of the nature of the offenses and his character.

# Conclusion

[35] For the reasons stated, we conclude the State presented sufficient evidence to support Martin's convictions for Class A felony child molesting, the trial court did not abuse its discretion when it sentenced Martin, and Martin's forty-eight-year sentence is not inappropriate given the nature of the offenses and his character.

[36] Affirmed.

[37] Mathias, J., and Crone, J., concur.