## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 06 2018, 9:32 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Anthony S. Churchward
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lee M. Stoy, Jr.
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Vincent P. Wells, Sr.,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | March 6, 2018<br><br>Court of Appeals Case No.<br>02A04-1709-CR-2126<br><br>Appeal from the Allen Superior Court<br><br>The Honorable Frances C. Gull, Judge<br><br>Trial Court Cause No.<br>02D05-1705-F5-118 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Vincent P. Wells, Sr. (Wells), appeals his sentence following his conviction for domestic battery, a Level 5 felony, Ind. Code § 35-42-2-1.3(c).

We affirm.

# ISSUE

Wells raises one issue on appeal, which we restate as: Whether Wells' sentence is inappropriate in light of the nature of the offense and his character.

# FACTS AND PROCEDURAL HISTORY

Wells and Ladonna Hinton (Hinton) have been married since September 21, 2013. Wells and Hinton have one child together, B.H. Wells also has several adult children from prior relationships, including Kayasha Wells (Kayasha).

In approximately January of 2017, Wells and Hinton, along with five-year-old B.H., moved into Kayasha's apartment in Fort Wayne, Allen County, Indiana. Sometime in March of 2017, Kayasha and her pastor, Cynthia Bennett (Pastor Bennett), traveled to Arkansas for "a revival." (Tr. Vol. II, p. 127). Wells offered to care for Kayasha's three children, ages nine, six, and five, and Pastor Bennett's three grandchildren, ages three, two and one, during their absence.

On March 17, 2017, at 6:30 a.m., Hinton awoke to the sound of Wells "yelling and shouting throughout the house," followed by him hitting her on the "lower back and legs" with his belt. (Tr. Vol. II, p. 27). Hinton subsequently got out

of bed, readied B.H. for preschool, and walked with B.H. to the bus stop. A short time later, Kayasha's children walked themselves to their bus stop. Pastor Bennett's grandchildren remained inside the apartment, sleeping or playing in their bedrooms.

[7] When Hinton returned to the apartment, she informed Wells that she had a meeting at B.H.'s school at 11:00 a.m.; however, Wells told her "no . . . that [she] had to stay and watch [Pastor Bennett's grandchildren because] there's nobody to watch them." (Tr. Vol. II, pp. 30-31). Wells purportedly had plans that morning to repair someone's vehicle, but Hinton was suspicious that Wells was actually engaging in extramarital activity with another female. Furthermore, Hinton had no interest in babysitting Pastor Bennett's grandchildren. Thus, a shouting match ensued, which escalated to a "tussle" consisting of them "pushing each other back and forth." (Tr. Vol. II, p. 32). Hinton ripped Wells' shirt, and he pushed her so that she "fell back onto the couch," at which time Wells had "one hand [grabbing Hinton's hair] and the other hand, he [used to] hit[] [Hinton] upside [her] head." (Tr. Vol. II, p. 32). By then, Hinton "was doing everything that [she] could to get away from [Wells]." (Tr. Vol. II, p. 32). Wells eventually stopped hitting, but the arguing persisted. Hinton began "calling him names," including telling "him he was the devil." (Tr. Vol. II, p. 36). Then, when Hinton said, "Shut up, you child molester," Wells responded by punching her in the nose. (Tr. Vol. II, p. 36). Blood immediately began "dripping," and Hinton was crying and shaking and

"couldn't breathe." (Tr. Vol. II, p. 37). She asked Wells to get a towel before she "just blacked out." (Tr. Vol. II, p. 37).

[8] After Hinton "came to," she began packing up her belongings, and those of B.H., with the intention of leaving. (Tr. Vol. II, p. 37). However, after gathering her bags, Wells stood in front of the door to block her. Wells called Pastor Bennett, who convinced Wells to allow Hinton to leave. As Hinton walked away from the building, she called the police.

[9] On May 2, 2017, the State filed an Information, charging Wells with Count I, domestic battery resulting in serious bodily injury, a Level 5 felony, I.C. § 35-42-2-1.3(c); Count II, domestic battery in the presence of a child under sixteen years of age, a Level 6 felony, I.C. § 35-42-2-1.3(b); and Count III, criminal confinement, a Level 6 felony, I.C. § 35-42-3-3(a). On May 5, 2017, the trial court issued a no-contact order against Wells, prohibiting him from contacting Hinton "in person, by telephone or letter, through an intermediary, or in any other way, directly or indirectly . . . while released from custody pending trial. This includes, but is not limited to, acts of harassment, stalking, intimidation, threats, and physical force of any kind." (Appellant's Conf. App. Vol. II, p. 23). On May 24, 2017, the State filed notice of its intent to seek a habitual offender sentencing enhancement based on Wells' prior felony convictions.

[10] On July 25 and 26, 2017, the trial court conducted a bifurcated jury trial. Despite Wells' claim of self-defense, at the close of the evidence, the jury returned a guilty verdict as to Counts I and II, the domestic battery charges.

The jury found Wells not guilty of Count III, criminal confinement. Thereafter, additional evidence was presented, and the jury found Wells to be a habitual offender. The trial court entered judgments of conviction and acquittal in accordance with the verdict. On August 22, 2017, the trial court held a sentencing hearing. The trial court merged Count II into Count I and imposed a six-year sentence for domestic battery as a Level 5 felony. The trial court then added a six-year habitual offender enhancement, resulting in an aggregate, fully executed sentence of twelve years.

[11] Wells now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

[12] Wells claims that his twelve-year sentence is inappropriate. Pursuant to Indiana Appellate Rule 7(B), our court may revise a sentence that is otherwise authorized by statute if, "after due consideration of the trial court's decision, [we] find[] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." "'[S]entencing is principally a discretionary function in which the trial court's judgment should receive considerable deference.'" *Parks v. State*, 22 N.E.3d 552, 555 (Ind. 2014) (quoting *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008)).

[13] Appellate Rule 7(B) provides for sentence review in an "attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell*, 895 N.E.2d at 1225. "[W]hether we

regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Id.* at 1224. Our court focuses on "the length of the aggregate sentence and how it is to be served." *Id.* Wells bears the burden of persuading this court that his sentence is inappropriate. *Corbally v. State*, 5 N.E.3d 463, 471 (Ind. Ct. App. 2014).

[14] With respect to the nature of the offense, "the advisory sentence is the starting point [that] our legislature has selected as [an] appropriate sentence for the crime committed." *Richardson v. State*, 906 N.E.2d 241, 247 (Ind. Ct. App. 2009). In this case, Wells was convicted of Level 5 felony domestic battery resulting in serious bodily injury, which is punishable by "a fixed term of between one (1) and six (6) years, with the advisory sentence being three (3) years." I.C. § 35-50-2-6(b). In addition, Wells was found to be a habitual offender, which allows the trial court to impose "an additional fixed term that is between . . . two (2) years and six (6) years[] for a person convicted of a Level 5 . . . felony." I.C. § 35-50-2-8(i)(2). Thus, the trial court imposed the maximum sentence allowed by the law—*i.e.*, twelve years.

[15] The evidence establishes that Wells battered his wife, who is also the mother of his child. He grabbed her by the hair while he repeatedly hit her in the head, and in response to her name-calling, he punched her in the nose and caused her to lose consciousness. Wells now argues that "the nature and circumstances of this offense cannot be considered the absolute worst, and are simply the acts necessary to commit the crimes with which . . . Wells was charged and

convicted." (Appellant's Br. p. 16). Thus, he insists that the maximum sentence is inappropriate, as it "should generally be reserved for the worst offenses and offenders." (Appellant's Br. p. 16).

[16] Our supreme court has observed that "the maximum possible sentences are generally most appropriate for the worst offenders." *Buchanan v. State*, 767 N.E.2d 967, 973 (Ind. 2002). "This is not, however, a guideline to determine whether a worse offender could be imagined. Despite the nature of any particular offense and offender, it will always be possible to identify or hypothesize a significantly more despicable scenario." *Id.* Thus, "we refer generally to the *class* of offenses and offenders that warrant the maximum punishment. But such class encompasses a considerable variety of offenses and offenders." *Id.*

[17] Notwithstanding whether Wells' conduct was more or less heinous than other domestic abusers, we find that a review of his character warrants the sentence imposed by the trial court. We first consider that he has amassed, as described by the trial court, an "astonishing criminal record," dating back to 1970. (Tr. Vol. II, p. 244). As a minor, Wells incurred four delinquency adjudications, two of which would have been felonies if committed by an adult (arson and burglary). As an adult, Wells accumulated sixteen misdemeanor convictions (for crimes that include battery, resisting law enforcement, disorderly conduct, criminal conversion, operating while suspended, visiting a common nuisance, criminal trespass, and possession of paraphernalia) and seventeen felony convictions (for crimes that include burglary, theft, dealing in cocaine,

possession of cocaine, and failure to return to lawful detention). At the time of the present offense, Wells was on parole.

[18] Wells acknowledges his lengthy criminal history but attempts to minimize its significance by arguing that "many of his felony convictions were the result of multiple [t]heft charges for which he was sentenced at the same time." (Appellant's Br. p. 15). Wells also argues that "the vast majority of [his prior convictions] amounted to non-violent property, driving or drug related crimes." (Appellant's Br. pp. 15-16). We first note that the fact that sentencing proceedings may have been combined does not negate the fact that Wells has been convicted of *eleven* separate instances of felony theft. Furthermore, when this court examines a criminal history as part of Appellate Rule 7(B) review, we consider not just the severity of past and present crimes, but also, importantly, whether the defendant's past encounters with the criminal justice system have served to rehabilitate him and deter future criminal conduct. *See, e.g., Atwood v. State*, 905 N.E.2d 479, 488 (Ind. Ct. App. 2009), *trans. denied*.

[19] As the trial court described, Wells has "been given short jail sentences, longer jail sentences, short terms of probation[,] longer terms of probation, short terms in the Department of Correction, and longer terms in the Department of Correction. [He has] been give[n] the benefit of parole, Community Control Program, the Re-Entry Court Program, Criminal Division Services, and substance abuse treatment." (Tr. Vol. II, p. 245). He has had "one suspended sentence modified, one felony sentence modified, . . . [his] probation modified once and revoked once, and . . . parole revoked once. Nothing has worked."

(Tr. Vol. II, p. 245). In fact, Wells has previously been convicted of battery, but the consequences of that conviction failed to dissuade Wells from committing the instant offense. Simply, Wells has refused to lead a law-abiding life.

[20] Further reflective of his poor character and perpetual refusal to abide by the court's authority is that, while incarcerated, Wells—despite the no-contact order—called Hinton. In at least one phone call, he repeatedly instructed Hinton to contact the prosecutor and declare that she had decided not to "press[] any charges." (State's Exh. 17). Wells had been informed of his pending felony charges and realized that he was going to "miss out on everything." (State's Exh. 17). Wells thus directed Hinton to inform the prosecutor that "it was fake" and that she "made it up" so that the State could not take the matter to trial. (State's Exh. 17). Attempts to interfere with the criminal justice process and to bully victims of domestic violence are not well-taken by this court.

[21] We are also unpersuaded by Wells' request to consider his "mental health issues" as a reason for reducing his sentence because he has failed to demonstrate a nexus between the crime committed and his self-reported diagnoses of "depression, generalized anxiety, post-traumatic stress disorder and paranoid schizophrenia." (Appellant's Br. p. 16); *see, e.g.*, *Steinberg v. State*, 941 N.E.2d 515, 534-35 (Ind. Ct. App. 2011), *trans. denied*. The record establishes that Wells has repeatedly failed to take advantage of the court's past leniency and reform his criminal mindset. Wells is the very definition of a habitual offender, and his sentence is not inappropriate.

# CONCLUSION

Based on the foregoing, we conclude that Wells' twelve-year sentence is not inappropriate in light of the nature of the offense and his character.

Affirmed.

Baker, J. and Brown, J. concur