## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 22 2020, 9:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Kelly M. Starling
Valerie K. Boots
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Vickie S. Harper, *Appellant-Defendant,* | September 22, 2020 |
| v. | Court of Appeals Case No. 20A-CR-175 |
| | Appeal from the Marion Superior Court |
| State of Indiana, *Appellee-Plaintiff.* | The Honorable Barbara Crawford, Judge |
| | Trial Court Cause No. 49G01-1804-MR-11648 |

**Kirsch, Judge.**

[1] After being charged with murder, Vickie S. Harper ("Harper") pleaded guilty to voluntary manslaughter,[1] a Level 2 felony. Other than requiring a sentence of no less the fifteen years, the plea agreement left sentencing to the discretion of the trial court which imposed a sentence of twenty years, with seventeen and a half years executed and two and a half years suspended to probation. On appeal, Harper raises three issues related to her sentence, which we consolidate and restate as follows:

> I. Whether the trial court abused its discretion in not recognizing mitigating factors supported by the record; and

> II. Whether Harper's sentence is inappropriate considering the nature of her offense and her character.

On cross appeal, the State raises one issue: whether Harper waived the right to appeal her sentence.

[2] We affirm.

## Facts and Procedural History

[3] Harper had a turbulent childhood. *Appellant's Conf. App. Vol. II* at 71. Her father was a verbally abusive alcoholic who attempted to sexually abuse her. *Tr. Vol. II* at 18. Harper witnessed her father physically abuse her stepmother

---

[1] *See* Ind. Code § 35-42-1-3.

and witnessed her mother being physically abused by Harper's stepfathers. *Appellant's Conf. App. Vol. II* at 67. Harper's mother married thirteen times and was physically and psychologically abused by several of her stepfathers. *Id*. at 78. Harper began psychological counseling when she was eight or nine years old, and she has remained in counseling much of her life. *Tr. Vol. II* at 18; *Appellant's App. Vol. II* at 67-68-70, 75-77. At some point Harper was diagnosed with Post Traumatic Stress Disorder ("PTSD"), anxiety, and panic attacks. *Id*. at 68-70, 75. She has taken a variety of psychotropic medications for much of her life. *Id*. at 68, 77. *Id*. at 68, 77.

[4] When Harper was a freshman in high school, she began a relationship with a high school senior, which lasted eight years and resulted in two children. *Tr. Vol. II* at 18-19. A few years after they separated, he was murdered. *Id*. Harper's first marriage lasted from 1989 until 1993. *Appellant's Conf. App. Vol. II* at 67. Her first husband was a drug addict, who "beat her all the time" and "put a knife up to her head." *Id*. at 19-20; *Appellant's Conf. App. Vol. II* at 67. He was murdered in a drug related incident. *Tr. Vol. II* at 20-23. In May 2014, Harper's second husband died of cancer. *Appellant's App. Vol. II* at 68-70.

[5] Harper and Jerry Ethridge ("Ethridge") began dating in 2016. *Appellant's Conf. App. Vol. II* at 23. They had a "terrible, fighting" relationship in which Ethridge "stayed drunk all the time, beating on her." *Tr. Vol. II* at 16. During one fourteen-month period, "police were called thirty-two times." *Appellant's Conf. App. Vol. II* at 176. From 2016 to 2017, Ethridge was charged four separate times for battering Harper and other offenses. In April 2016, Ethridge was

charged with four counts of invasion of privacy, one count of battery and one count of battery causing injury. *Tr. Vol. II* at 26; *Defendant's Exs.* at 43-50. According to the charges, Ethridge shot Harper three times with a taser and held a knife to her neck. *Tr. Vol. II* at 26; *Defendant's Exs.* at 47-50. Harper did not attend the trial, and Ethridge was convicted of either invasion of privacy or criminal recklessness.[2] *Tr. Vol. II* at 40-41; *Appellant's Conf. App. Vol. II* at 72.

[6] In May 2016, Ethridge was charged with domestic battery, battery resulting in bodily injury, invasion of privacy and interference with reporting of a crime. *Defendant's Exs.* at 53-56. The police report alleged that Ethridge came into Harper's home in violation of a protective order, demanded money, grabbed her wrists and took her phone away as she attempted to call police. *Id*. at 55. Ethridge was convicted of invasion of privacy. *Appellant's Conf. App. Vol. II* at 72.

[7] In December 2016, Ethridge was charged with two counts of domestic battery and two counts of battery. *Defendant's Exs.* at 37-41. During these incidents, Harper was allegedly on the phone with her mother, who "could hear [Ethridge] hollering at her and beating on her." *Tr. Vol. II* at 17. Harper suffered two black eyes and bruises on her neck, arms, and ear. *Defendant's Exs.* at 20-27. In April 2017, Ethridge was charged with strangulation, criminal

---

[2] One of the State's witnesses testified that Ethridge was convicted of invasion of privacy, but in his psychological evaluation of Harper, Dr Harper reported that Ethridge was conviction of criminal recklessness. *See Tr. Vol. II* at 40-41; *Appellant's Conf. App. Vol. II* at 72.

confinement, kidnapping, domestic battery, and interference with reporting a crime. *Id.* at 31-35. All charges were dismissed. *Tr. Vol. II* at 40. On April 19, 2017, Ethridge was charged with strangulation, criminal confinement, kidnapping, domestic battery, interference with reporting a crime, theft and criminal mischief. *Defendant's Exs.* at 31-35. Again, all charges were dismissed. *Tr. Vol. II* at 40. Nothwithstanding these charges, Ethridge was never convicted of battery and was convicted only of invasion of privacy on one occasion. *Id.* In a letter that Harper wrote much later for her allocution, she said that at the behest of Ethridge, she refused to testify against Ethridge in all of these cases. *Defendant's Exs.* 62.

[8]   Harper ended her relationship with Ethridge in April 2017. *Appellant's Conf. App. Vol. II* at 72. Between July 7 and July 8, 2017, about ten weeks after Harper ended this relationship, Harper and Ethridge exchanged a series of text messages. *Id.* at 37-39. At the time, there was an active protective order to prevent Ethridge from contacting Harper. *Tr. Vol. II* at 40. In these text messages, Harper told Ethridge that she had his mail, and he could come to her house to pick it up. *State's Exs.* at 14, 17. Ethridge asked Harper to put his mail in her mailbox, but Harper said no, stating she had medical paperwork to show him: "[T]here's paperwork I need to give you. So you can see for yourself about the H.I.V." *Id.* at 17. Ethridge went to Harper's house sometime between July 8 and July 9, and while he was there, Harper fired a shotgun at Ethridge, killing him. *Tr. Vol. II* at 32-33, 36.

[9] In Harper's initial statement to police, she claimed Ethridge forced her onto the couch, ripped off her pajamas, and licked her breasts and vagina. *Appellant's Conf. App. Vol. II* at 24. She also contended that Ethridge took the loaded shotgun she kept in her home and "shoved the barrel of the shotgun up into her vagina." *Id*. She also claimed Ethridge raped her. *Id*. at 77, 181. She admitted she eventually picked up the shotgun but claimed the shooting was accidental because the shotgun had a "hair-trigger." *Id*. at 25.

[10] A forensic examination of Harper's pajamas concluded that her pajamas had been cut with scissors, rather than torn. *Tr. Vol. II* at 34-35. Forensic testing of the shotgun found no DNA from Ethridge on the shotgun. *Id*. at 36. The testing confirmed the presence of Harper's DNA on the outside and inside of the shotgun barrel. *Id*. Detective Dan Kepler testified that it would be improbable that DNA would still be inside the barrel after it was fired because heat would degrade and eliminate DNA. *Tr. Vol. II* at 36-37. Forensic analysis of the shotgun determined that it had a trigger pull of 2.27 to 2.52 pounds, which would not be considered a "hair-trigger." *Id*. at 36; *Appellant's Conf. App. Vol. II* at 31. Testing of Harper's cell phone revealed that she deleted approximately twenty messages from her phone that were sent or received between July 7 and July 9, 2017. *State's Exs.* at 3-4. Among the deleted messages was one inviting Ethridge to her home sent at 8:58 p.m. on July 8, 2017: "My front door [is] open. If you want to talk you know where I live." *Id.* at 7.

[11]    On April 10, 2018, Harper was charged with murder. *Appellant's App. Vol. II* at 32-33. While incarcerated, she was evaluated for competency by Dr. George Parker ("Dr. Parker") and Dr. Don Olive ("Dr. Olive"). *Appellant's Conf. App. Vol. II* at 67-82. Dr. Olive diagnosed Harper with PTSD and major depressive disorder. *Id*. at 82. Dr. Olive found no evidence of a mental defect such as grandiose delusions or hallucinations at the time of Harper's offense. *Id*. Dr. Olive said he saw no symptomology of PTSD, such as flashbacks, that would render Harper unable to appreciate the wrongfulness of her conduct. *Id*. Dr. Parker diagnosed Harper with PTSD and depression. *Id*. at 73. He found that Harper "did not have significantly impaired perception at the time of the alleged offense and thus did not meet Indiana statutory criteria for having a mental disease at that time." *Id*. at 74. Both doctors concluded that Harper was competent to stand trial. *Id*. at 67-82.

[12]    On November 13, 2019, Harper and the State entered into a plea agreement in which Harper agreed to plead guilty to Level 2 felony voluntary manslaughter and the State would dismiss the murder charge. *Appellant's App. Vol. II* at 8, 165. The plea agreement also provided that Harper's sentence would be at least fifteen years. *Id*. at 165. Harper initialed a provision in the plea agreement that provided that she "hereby waive[d] the right to appeal any sentence imposed by the Court, including the right to seek appellate review of the sentence pursuant to Indiana Appellate Rule 7(B)." *Id*. at 166.

[13]    On December 19, 2019, the trial court held a combined hearing for Harper's guilty plea and sentence. *Tr. Vol. II* at 2-64. At the guilty plea portion of the

hearing, Harper told the trial court that she had read the plea agreement and talked about it with her attorney. *Id.* at 6. The trial court advised Harper that by pleading guilty, she was surrendering the right to appeal her guilt. Specifically, the trial court said: (1) "By pleading guilty today, you give up the right to appeal the finding of guilt," (2) "You will not be able to challenge this finding of guilt because you are admitting your guilt," and (3) "[Y]ou do however, have the right to appeal any portion of this proceeding that you believe is fundamentally unfair." *Id*. at 10-11. The State did not object to these advisements.

[14] The evidence presented at the sentencing portion of the combined hearing included evidence that Harper had four other contacts with the criminal justice system. *Id.* at 54; *Appellant's Conf. App. Vol. II* at 170, 173-74. This included a conviction for a prescription drug offense, violation of the terms of her probation, and charges for theft and public intoxication. *Appellant's Conf. App. Vol. II* at 173-74. Evidence regarding Harper's mental illnesses was also presented. Harper had been diagnosed with post-traumatic stress disorder, generalized anxiety disorder, and severe depression. *Tr. Vol. II* at 6; *Appellant's Conf. App. Vol. II* at 68, 70. Harper had a childhood history of witnessing her father physically abuse her stepmother, and her mother being physically abused by some of her stepfathers. *Appellant's Conf. App. Vol. II* at 67. In addition, Harper suffered "persistent physical abuse" from her first husband between 1989 and 1993. *Id.*

Harper presented photographs to the court showing the injuries which she sustained that were allegedly caused by Ethridge. *Tr. Vol. II* at 17, 21; *Defendant's Exs.* at 20-27. Harper's mother also testified that the relationship between Harper and Ethridge was "terrible." *Tr. Vol. II* at 17. In her written statement of allocution, Harper apologized to Ethridge's family, writing, "But he did abuse me, physically and emotionally." *Defendant's Exs.* at 62. She further wrote that Ethridge pushed her to a point where she "couldn't take it anymore." *Id.*

The State asked the trial court to impose a sentence of thirty years. *Tr. Vol. II* at 53. Harper asked the trial court to impose a sentence of fifteen years, with five years in prison, five years of probation, and five years suspended. *Id.* at 52. The trial court found Harper and Ethridge had been separated for some time when Harper invited Ethridge to her house. *Id.* at 60. It identified as a mitigating factor Harper's remorse as expressed in her allocution letter. *Id.*; *Defendant's Exs.* at 62. The trial court also found it mitigating that by pleading guilty, Harper had accepted responsibility for her actions. *Tr. Vol. II* at 60. Finally, the court found it mitigating that Harper was classified as a low risk to reoffend. *Id.* In aggravation, the trial court identified Harper's history of contacts with the criminal justice system. *Id.* It found as a "pretty serious" aggravator Harper's attempt to cover up her crime. *Id.* In light of those efforts, the trial court did not consider the alleged rape as a mitigating factor. *Id.* The trial court also concluded "that the State took into consideration the history of Ms. Harper and all of the abusive relationships which she had, in offering to

allow her to plead guilty to voluntary manslaughter." *Id.* The trial court found that the aggravators outweighed the mitigators. *Id.* at 60-61. It sentenced Harper to twenty years, with seventeen and a half years executed and two and a half suspended to probation. *Id.* at 61. After the trial court announced its sentence, defense counsel asked the trial court to advise Harper about her right to appeal her sentence. The trial court advised Harper as follows: (1) "Ms. Harper, since this sentence left a great deal to the Court's discretion in terms of the length of sentence and how it was supposed to be served, you have the right to appeal the Court's decision on the sentence that was imposed," and (2) "the Public Defender's Office is assigned to represent you in perfecting your appeal in the sentencing of this case." *Id* at 62. The State did not object to these advisements. Harper now appeals. We will provide additional facts as necessary.

## Discussion and Decision

## The State's Cross Appeal[3]

[17] The State argues that Harper has waived the right to appeal her sentence because, as the State correctly observes, Harper's plea agreement stated that she "hereby waive[d] the right to appeal any sentence imposed by the [trial court], including the right to seek appellate review of the sentence pursuant to Indiana Appellate Rule 7(B)." *Appellant's App. Vol. II* at 166. The State is also correct

---

[3] Harper has filed a motion to strike portions of the State's brief. Through a separately issued order, we deny Harper's motion.

that at the combined hearing for Harper's guilty plea and sentence, Harper told the trial court that she had read the plea agreement and discussed it with her attorney. *Tr. Vol. II* at 6.

[18] Harper responds by citing statements made by the trial court at the hearing that advised Harper that she was waiving only the right to appeal the determination of guilt and that she still maintained the right to appeal her sentence. Harper points to the following colloquy that occurred before the trial court accepted Harper's guilty plea:

> THE COURT: Usually if someone goes to trial and if they are found guilty, they have the right to appeal that conviction. A conviction means a finding of guilt by whoever is trying the case. By pleading guilty today, *you give up the right to appeal the finding of guilt*. Do you understand that?
>
> [Harper]: Yes.
>
> THE COURT: There will be no trial. An order of conviction will be entered against you by the Court. *You will not be able to challenge this finding of guilt* because you are admitting your guilt. Do you understand that?
>
> [Harper]: Yes.
>
> THE COURT: You are — you do[,] however, *have the right to appeal any portion of this proceeding that you believe is fundamentally unfair*. Do you understand that as well?
>
> [Harper]: Yes.

*Tr. Vol. II* at 10-11 (emphasis added).

[19]     Harper also refers us to the following colloquy that occurred at the end of the sentencing portion of the combined hearing.

> THE COURT:  All right, first of all, with regard to your right to appeal, Ms. Harper, since this sentence left a great deal to the Court's discretion in terms of the length of sentence and how it was supposed to be served, *you have the right to appeal the Court's decision on the sentence that was imposed. So, you have the right to do that*.

> [DEFENSE COUNSEL]:  Judge, [Harper] does wish to appeal and would ask that the Public Defender be appointed pauper counsel to perfect that appeal.

> THE COURT:  All right, the Court will make that finding at this time, that you will be assigned — or that the Public Defender's Office is assigned to *represent you in perfecting your appeal in the sentencing of this case*.

*Id.* at 63 (emphasis added).

[20]     "[A] defendant who pleads guilty may waive the right to appellate review of his or her sentence only if this waiver is knowing and voluntary." *Johnson v. State*, 145 N.E.3d 785, 786 (Ind. 2020) (citing *Creech v. State*, 887 N.E.2d 73 (Ind. 2008).  Creech had signed a plea agreement in which he waived the right to appeal his sentence.  *Creech*, 887 N.E.2d at 74.  The trial court did not address this provision at the guilty plea hearing or at the sentencing hearing; at the very end of the sentencing hearing, the trial court erroneously advised Creech that he

did have the right to appeal his sentence. *Id*. On appeal, Creech argued that because of the trial court's erroneous advisement at the sentencing hearing, he had not knowingly and voluntarily waived his right to appeal his sentence and thus proceeded to argue that his sentence was inappropriate. *Id*. Our supreme court disagreed, ruling that the trial court's erroneous advisement at the sentencing hearing did not override the provision in the plea agreement by which Creech had waived the right to appeal his sentence. *Id*. at 75-77. Part of the Supreme Court's reasoning was that because the trial court properly advised Creech at the guilty plea hearing that he had waived the right to appeal his sentence and then accepted Creech's plea and entered judgment on Creech's plea, the erroneous advisement from the trial court at the sentencing hearing had no bearing on the validity of Creech's plea agreement: "[b]y the time the trial court erroneously advised Creech of the possibility of appeal, Creech had already pled guilty and received the benefit of his bargain." *Id*. at 77.

[21] In *Ricci v. State*, 894 N.E.2d 1089 (Ind. Ct. App. 2008), *trans. denied*, we distinguished *Creech*, finding that it did not address situations in which a trial court makes erroneous statements at the guilty plea hearing about the right to appeal a sentence and whether those erroneous statements render a defendant's waiver of his right to appeal his sentence unknowing, involuntary, and unintelligent. *Id*. at 1093. As in *Creech*, Ricci's plea agreement contained a provision that waived his right to appeal his sentence. *Id*. at 1090. Nonetheless, at the guilty plea hearing the trial court unambiguously stated that Ricci's plea agreement did not waive his right to appeal his sentence. *Id*. at

1093. Neither the prosecutor nor the defense attorney contradicted this statement. *Id*. at 1093. Because of what transpired at the guilty plea hearing, we found that Ricci had not waived the right to appeal his sentence. *Id*. at 1093-94.

[22] In *Bonilla v. State*, 907 N.E.2d 586 (Ind. Ct. App. 2009), *trans. denied*, we held that despite a provision in Bonilla's plea agreement that he was waiving his right to appeal his sentence, Bonilla could still appeal his sentence because the trial court made misleading statements about Bonilla's right to appeal not only during his guilty plea hearing but also at his sentencing hearing. *Id*. at 588-90. *Bonilla* differed from *Ricci* because while the trial court in *Ricci* unambiguously told Ricci during the guilty plea hearing that he had the right to appeal his sentence, the trial court in *Bonilla* sent Bonilla mixed signals during the guilty plea hearing, first telling Bonilla that he may have waived the right to appeal his sentence but then telling Bonilla that he had the right to appeal his sentence and that he had the right to an attorney for the appeal of his sentence. *Id*. We acknowledged that this was the kind of scenario our Supreme Court warned about in *Creech*. *Id*. at 589. We stated:

> Although the trial court advised Bonilla that he "may" have waived the right to appeal his sentence, the court promptly advised Bonilla of the right to appeal and the right to an attorney. This advisement occurred at the guilty plea hearing, which is *before Bonilla received the benefit of his bargain*. It then occurred again at his sentencing hearing.

*Id.* at 590 (emphasis added). We held that Bonilla did not waive the right to appeal his sentence. *Id.*

[23] Finally, in *Holloway v. State*, 950 N.E.2d 803 (Ind. Ct. App. 2011), we addressed a situation procedurally similar to Harper's case, in which the guilty plea hearing and sentencing hearing were combined into one hearing. *Id*. at 805. Holloway had agreed to plead guilty to burglary. *Id*. His plea agreement included a waiver of his right to appeal the sentence, and he initialed that provision. *Id*. at 804-05. At the combined guilty plea and sentencing hearing, the trial court told Holloway at least twice that he could appeal the sentence. *Id*. at 804-06. We held that Holloway did not knowingly and voluntarily waive appellate review of his sentence. *Id*. at 806. "The trial court's advisement that Holloway had the right to appeal occurred at his combined guilty plea and sentencing hearing, before Holloway received the benefit of his plea bargain . . . . Holloway did not knowingly and intelligently waive his right to appeal his sentence . . . ." *Id*.

[24] Here, we find that the trial court's statements during the guilty plea portion of the combined hearing were sufficiently ambiguous and confusing such that Harper's waiver of her right to appeal her sentence was not knowing and voluntary. During that portion of the combined hearing, the trial court twice advised Harper that by pleading guilty, she was waiving only her right to appeal the determination of guilt. "By pleading guilty today, *you give up the right to appeal the finding of guilt*." *Tr. Vol. II* at 10. (emphasis added). "*You will not be able to challenge this finding of guilt* because you are admitting your guilt." *Id*.

(emphasis added).  At no point during this portion of the combined hearing did the trial court advise Harper that she was waiving the right to her appeal her sentence.  And while the trial court did not explicitly tell Harper that she had the right to appeal her sentence, the trial court did advise Harper that she retained the right to appeal:  "[Y]ou do however, have the right to appeal any portion of this proceeding that you believe is fundamentally unfair."  *Id.* at 11.  We recognize that Harper's situation is not like the situations in *Ricci* and *Bonilla* where both defendants were explicitly advised during their guilty plea hearings that they retained the right to appeal their sentences despite the waiver provisions in their plea agreements.  Even so, we find the trial court's statements here sufficiently ambiguous and confusing to render Harper's waiver of her right to appeal her sentence unknowing and involuntary.  And as in *Bonilla*, the trial court compounded the confusion by telling Harper at the sentencing portion of the combined hearing that she had the right to appeal her sentence.  *Id*. at 63.  Finally, as in *Holloway*, the trial court's advisements that Harper had the right to appeal occurred at a combined guilty plea and sentencing hearing, that is, before Harper received the benefit of her plea bargain.  *See Holloway*, 950 N.E.2d at 806.  Thus, Harper did not knowingly and intelligently waive her right to appeal her sentence.

## Abuse of Discretion

[25]  Harper contends the trial court abused its discretion in three ways:  First, Harper claims the trial court abused its discretion because it failed to consider Harper's PTSD as a mitigating factor;  second, Harper claims the trial court

abused its discretion because it did not recognize the abuse that Harper suffered at the hands of Ethridge as a mitigating factor; and, third, Harper claims that the trial court abused its discretion by acknowledging Harper's history of being abused but failing to cite that history as a mitigating factor because, according to the trial court, that history was already taken into account by the State's decision to offer a plea deal to Harper.

> A trial court abuses its discretion if it: (1) fails to enter a sentencing statement at all; (2) enters a sentencing statement that explains reasons for imposing a sentence—including a finding of aggravating and mitigating factors if any—but the record does not support the reasons; (3) enters a sentencing statement that omits reasons that are clearly supported by the record and advanced for consideration; or (4) considers reasons that are improper as a matter of law. If the trial court has abused its discretion, we will remand for resentencing if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record. However, the relative weight or value assignable to reasons properly found, or those that should have been found, is not subject to review for abuse of discretion.

*Pitts v. State*, 904 N.E.2d 313, 320 (Ind. Ct. App. 2009) (internal quotations and citations omitted), *trans. denied*. Determining mitigating circumstances is within the trial court's discretion. *Steinberg v. State*, 941 N.E.2d 515, 534 (Ind. Ct. App. 2011), *trans. denied*. A trial court is not obligated to accept the defendant's arguments as to what constitutes a mitigating factor, and it is not required to give the same weight to proffered mitigating factors as the defendant does. *Id*. To establish that mental illness is a mitigating factor, a defendant must establish

a nexus between the mental illness and the crime at issue. *Id.* Other relevant factors include: (1) the extent of the defendant's inability to control his or her behavior due to the disorder or impairment and (2) the duration of the mental illness. *Smith v. State*, 770 N.E.2d 818, 823 (Ind. 2002).

[26] Here, while the record establishes that Harper had a long-standing diagnosis of PTSD, none of the other requirements for establishing mental health as a mitigating factor apply to Harper. There was no evidence that she was unable to control her behavior as a result of her PTSD. In fact, one of the doctors who evaluated her concluded that there was no observable symptomatology of PTSD, like dissociative symptoms. *Appellant's Conf. App. Vol. II* at 82. Further, the nature of her crime itself suggests Harper retained the ability to control her thoughts and actions, including luring Ethridge to her house then hatching a scheme to cover up her crime. *Tr. Vol. II* at 39. Similarly, there is no evidence of a nexus between Harper's PTSD and her shooting Ethridge. There is no indication that Harper was experiencing a flashback, or otherwise suffering from a specific symptom of PTSD at the time that she shot Ethridge. *Id.* Thus, we find no abuse of discretion in the trial court failure to cite Harper's PTSD as a mitigating factor. *See Denham v. State*, 142 N.E.3d 514, 518 (Ind. Ct. App. 2020) ("Denham did not present evidence establishing that his mental illness had a nexus to his commission of this aggravated battery."), *trans. denied*.

[27] Harper next claims the trial court abused its discretion by failing to acknowledge that Ethridge had physically and verbally abused Harper during their relationship. Harper is correct that the trial court did not explicitly state

that Ethridge had abused Harper. In *Green v. State*, we recognized that a history of abuse of the defendant by the victim can be a mitigating factor if the record contains substantial, credible evidence of such abuse. 65 N.E.3d 620, 637 (Ind. Ct. App. 2016), *trans. denied*. Here, Harper is correct that the record contains substantial, credible evidence that Ethridge repeatedly abused her. Harper and Ethridge had a "terrible, fighting" relationship in which Ethridge "stayed drunk all the time, beating on her." *Tr. Vol. II* at 16. From 2016 to 2017, Ethridge was charged four separate times for battering Harper. *Id*. at 26; *Defendant's Exs.* at 53-56.

[28] We acknowledge that determining mitigating circumstances is within the trial court's discretion and that a trial court is not obligated to accept a defendant's arguments as to what constitutes a mitigating factor. *Pitts*, 904 N.E.2d at 320. Moreover, a trial court is not required to give the same weight to proffered mitigating factors as a defendant does. *Steinberg*, 941 N.E.2d at 534. However, a trial court abuses its discretion if it overlooks substantial mitigating factors that are clearly supported by the record. *Green*, 65 N.E.3d at 636.

[29] Here, Harper has met her burden to show that the record establishes that Ethridge frequently abused her and that the trial court should have recognized this history as a mitigating factor at sentencing. Therefore, the trial court abused its discretion in failing to identify this history of abuse as a mitigating factor. However, we need not remand this case for resentencing because we can "say with confidence that the trial court would have imposed the same sentence" had it considered the evidence that Ethridge often abused Harper.

*See Pitts*, 904 N.E.2d at 320. First, it is inconceivable the trial court was unaware of the evidence that Ethridge had abused Harper. We can reasonably infer that such an awareness was illustrated by the trial court's statement that "the State took into consideration the history of Ms. Harper *and all of the abusive relationships she had been in*, in offering to allow her to plead guilty to voluntary manslaughter." *Tr. Vol. II* at 60 (emphasis added). And even though the trial court did not explicitly find that Ethridge was one of those abusers, it is not unreasonable to interpret this statement as a finding that Ethridge had abused Harper and that it was a factor that should have been taken into account. Harper contends that this statement is not an acknowledgement of the trial court of Ethridge's abuse of Harper, and that a separate, explicit finding is necessary.

[30] Much of Harper's argument is based on how she characterizes the nature of her offense. She claims that her crime was "no more egregious than a typical voluntary manslaughter case" – *see Appellant's Br.* at 25 - and appears to contend that if the trial court on remand were to make a finding about Ethridge's abuse of Harper, the trial court would conclude that the nature of her offense was not egregious and would thus impose a more lenient sentence. When determining the appropriateness of a sentence that deviates from an advisory sentence, we consider whether there is anything more or less egregious about the offense as committed by the defendant that makes it different from the typical offense accounted for by the legislature when it set the advisory sentence. *Moyer v. State*, 83 N.E.3d 136, 142 (Ind. Ct. App. 2017), *trans. denied*.

[31]     We are confident the trial court would find this argument unconvincing and would still impose the same sentence. While the offense that Harper pleaded guilty to, voluntary manslaughter, has the element of sudden heat – *see* Indiana Code section 35-42-1-3 – Harper's killing of Ethridge was not the product of sudden heat but was the result of Harper's calculated, deliberate plan to lure Ethridge to her home, kill him with a shotgun, and execute a detailed plan to cover up her crime. *Tr. Vol. II* at 34-35, 39; *Appellant's Conf. App. Vol. II* at 24, 25, 77, 181; *State's Exs.* at 3-4. Luring a victim to a location to kill him is a valid aggravating factor. *See Smith v. State*, 638 N.E.2d 1255, 1257 (Ind. 1994) (luring the victim to the place where the defendant killed the victim was a valid aggravating factor).

[32]     Other factors convince us that Harper's crime was not a typical instance of voluntary manslaughter and that the trial court on remand would reach the same conclusion. Harper had ended her relationship with Ethridge about ten weeks before she asked him to come get his mail at her house. *Appellant's Conf. App. Vol. II* at 72. Nonetheless, Harper devised a plan to entice Ethridge to her house to kill him. Also, when Harper asked Ethridge to come to her apartment to pick up his mail, there was an active protective order against Ethridge, yet she chose to disregard that protective order. *Tr. Vol. II* at 40. Furthermore, when Ethridge initially declined to come to Harper's home, Harper persisted in asking Ethridge to come to her home, claiming she was holding important medical papers for Ethridge, one which she claimed gave results of a test that Ethridge had taken to determine if he was HIV positive. *State's Exs*. at 17.

These facts demonstrate calculated thinking, planning, and clever improvisation, undermining Harper's argument that her crime was not an egregious type of manslaughter. We are confident the trial court would reach the same conclusion and thus impose the same sentence if we were to remand the case for re-sentencing.

[33] Reinforcing this conclusion are Harper's contacts with the criminal justice system, which the trial court cited as an aggravating factor. Even a minor criminal record reflects poorly on a defendant's character. *Reis v. State*, 88 N.E.3d 1099, 1105 (Ind. Ct. App. 2017). Harper has four other contacts with the criminal justice system, which include a 1998 Class D felony conviction for a "prescription offense," which was reduced to a Class A misdemeanor. *Appellant's Conf. App. Vol. II* at 173-74. Harper violated the terms of probation for that conviction. *Id*. at 173.

[34] Finally, we are confident the trial court would impose the same sentence on remand because of the restrictions of the plea agreement and the sentencing range for Level 2 felonies, which runs from a minimum of ten years to a maximum of thirty years with an advisory sentence of seventeen and a half years. *See* Ind. Code § 35-50-2-4.5. The plea agreement required the trial court to impose a sentence of at least fifteen years. *Appellant's App. Vol. II* at 165. Thus, the twenty year sentence the trial court imposed is ten years less than the maximum sentence for Level 2 felonies and only five years more than the minimum sentence required by the plea agreement. Because the trial court suspended two and a half years to probation, Harper will be required to serve

seventeen and a half years, which is the advisory sentence for Level 2 felonies. Given that the trial court already imposed a sentence on the lower end of the range allowed by the plea agreement and statutory parameters, and considering the nature of Harper's offense and the aggravating factors found by the trial court, we are confident that the trial court would, if asked, impose the same sentence on remand. Thus, even though the trial court abused its discretion in not citing Ethridge's history of abusing Harper, we decline to remand this matter for sentencing.

[35] Finally, Harper appears to claim that the trial court abused its discretion in the way it acknowledged that Harper was physically abused. As we noted above, the trial court found that "the State took into consideration the history of . . . Harper and all of the abusive relationships she had been in, in offering to allow her to plead guilty to voluntary manslaughter." *Tr. Vol. II* at 60. Harper, still insisting this statement applies not to Ethridge but to the other men who had abused her, admits that the State claimed it offered the plea agreement based on its understanding there were mitigating factors. *Id*. at 54. Harper contends, however, that the State's reasons for offering a plea deal are not relevant to whether the trial court should have recognized the past abuse of Harper. Harper contends that the by deferring to the State's plea-bargaining discretion in identifying a mitigating factor, the trial court "shirk[ed] its statutory duties." *Appellant's Br.* at 12.

[36] To address this argument, we examine the timeline of the abuse Harper suffered from men other than Ethridge. Although the record is not clear, it appears that

the last physical abuse that Harper suffered before she began dating Ethridge in 2015 was at the hands of her first husband, who died in 1993. *Id.* at 19-23; *Appellant's Conf. App. Vol. II* at 67-68, 78. Thus, the last incident of abuse she suffered from people other than Ethridge occurred at least thirteen years before Harper began dating Ethridge and at least fifteen years before she killed him. Given this significant gap in time, we find that the trial court did not abuse its discretion by acknowledging that the State had taken this history of abuse into account in offering a plea deal to Harper yet did not identify this as a mitigating factor. *See Pitts*, 904 N.E.2d at 320 (determining what constitutes a mitigating circumstance is a matter of trial court discretion; trial court is not obligated to accept a defendant's arguments as to what constitutes a mitigating factor).

## Inappropriate Sentence

[37] Harper also contends that her sentence is inappropriate. Under Indiana Appellate Rule 7(B), we may revise a sentence if, after due consideration of the trial court's decision, we find the sentence is inappropriate considering the nature of the offense and the character of the offender. *Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (2007). The "nature of offense" compares the defendant's actions with the required showing to sustain a conviction under the charged offense, *Cardwell v. State,* 895 N.E.2d 1219, 1224 (Ind. 2008), while the "character of the offender" permits for a broader consideration of the defendant's character. *Anderson v. State*, 989 N.E.2d 823, 827 (Ind. Ct. App. 2013), *trans. denied*. Whether a sentence is inappropriate turns on our sense of the culpability of the defendant, the severity

of the crime, the damage done to others, and other factors that come to light in a given case. *Cardwell*, 895 N.E.2d at 1224.

[38]     We consider not only the aggravators and mitigators found by the trial court but also any other factors appearing in the record. *Johnson v. State*, 986 N.E.2d 852, 856 (Ind. Ct. App. 2013). We defer to the trial court's decision, and our goal is to determine whether the appellant's sentence is inappropriate, not whether some other sentence would be more appropriate. *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). "Such deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). When we review a sentence, we seek to leaven the outliers, not to achieve a perceived correct result. *Cardwell*, 895 N.E.2d at 1225.

[39]     Harper contends her twenty-year sentence is inappropriate considering the nature of her offense because her crime was not more egregious than a typical voluntary manslaughter case and also because of her history of being abused by Ethridge. "As to the nature of the offense, the advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed." *Kunberger v. State*, 46 N.E.3d 966, 973 (Ind. Ct. App. 2015). When determining the appropriateness of a sentence that deviates from an advisory sentence, we consider whether there is anything more or less egregious about the offense as committed by the defendant that makes it different from

the typical offense accounted for by the legislature when it set the advisory sentence. *Moyer*, 83 N.E.3d at 42.

[40] Harper pleaded guilty to Level 2 felony voluntary manslaughter. A Level 2 felony carries a minimum sentence of ten years, a maximum sentence of thirty years, and an advisory sentence of seventeen and a half years. Ind. Code § 35-50-2-4.5. Also, the plea agreement set the minimum sentence at fifteen years. *Appellant's App. Vol. II* at 165. Thus, in imposing a sentence of twenty years, the trial court imposed a sentence that exceeded the minimum statutory term by five years and exceeded the statutory advisory term by two and a half years. By suspending two and a half years of Harper's sentence to probation, the trial court ordered her to execute seventeen and a half years of her sentence, the advisory sentence for Level 2 felonies. Ind. Code § 35-50-2-4.5. Given the statutory parameters and the terms of the plea agreement, a twenty-year sentence for the nature of Harper's sentence is not inappropriate.

[41] Moreover, as we discussed earlier, we reject Harper's argument that her crime was no worse than the typical voluntary manslaughter. Harper's killing of Ethridge was not the product of sudden heat but the result of a deliberate plan to lure Ethridge to her home, kill him with a shotgun, and carry out a detailed plan to cover up her crime. *Tr. Vol. II* at 34-35, 39; *Appellant's Conf. App. Vol. II* at 24-24, 77, 181; *State's Exs.* at 3-4. More specifically, when Harper asked Ethridge to come to her home to pick up his mail, Harper had ended her relationship with Ethridge about ten weeks earlier. *Appellant's Conf. App. Vol. II* at 72. Also, when Harper asked Ethridge to come to her apartment to pick up

his mail, there was an active protective order against Ethridge which she chose to disregard when she invited Ethridge to her home. *Tr. Vol. II* at 40. Furthermore, when Ethridge initially declined to come to Harper's home and asked Harper to put his mail in her mailbox, Harper persisted in asking Ethridge to come to her home, claiming that she was holding important medical papers for Ethridge, one which she claimed gave results of a test that Ethridge had taken to determine if he was HIV positive. *State's Exs.* at 17. As we stated above, these facts demonstrate calculated thinking, planning, and clever improvisation, undermining Harper's argument that her crime was not an egregious type of manslaughter.

[42] We acknowledge Harper's argument that Ethridge's frequent abuse of her lessens the severity of the nature of her offense, and we have great sympathy for her. Harper's frequent victimization goes to the issue of her character because it plausibly lessens her culpability for her offense. *See Cardwell*, 895 N.E.2d at 1224. However, we balance these factors against the details of Harper's crime. As discussed above, Harper lured Ethridge to her home, killed him with a shotgun, and attempted to cover up her crime by claiming that Ethridge had raped her, staging evidence to make it appear that Ethridge had inserted the shotgun into Harper's vagina, and deleting numerous text messages. *Tr. Vol. II* at 34-35, 39; *Appellant's Conf. App. Vol. II* at 24-24, 77, 181; *State's Exs.* at 3-4. Our role is not to determine whether Harper's sentence in light of the nature of her offense is appropriate, but to determine whether her sentence is inappropriate. Based on the foregoing factors, we conclude that Harper's

sentence in light of the nature of her offense is not inappropriate. *See Conley*, 972 N.E.2d at 876.

[43] As to her character, Harper claims her sentence is inappropriate because of her long-term PTSD, her history of being physically abused, and limited criminal record. Even though Harper's criminal record is not significant, it nonetheless reflects poorly on her character. Even a minor criminal record reflects poorly 0n a defendant's character. *Reis*, 88 N.E.3d at 1105. Harper has 1998 Class D felony conviction for a "prescription offense," which was reduced to a Class A misdemeanor. *Appellant's Conf. App. Vol. II* at 173-74. She violated the terms of probation for this conviction. *Id.* at 173. Two charges she faced were dismissed. *Id*. Around the time that Harper killed Ethridge, she got into a fight in Jennings County after a drug deal went awry, and she was charged with theft and public intoxication. *Tr. Vol. II* at 44; *Appellant's Conf. App. Vol. II* at 174.

[44] We have already determined that Harper's PTSD is not a mitigating factor because she has not established a nexus between her mental illness and her crime. *See Denham*, 142 N.E.3d at 518 (no evidence establishing that Denham's mental illness had a nexus to his crime of aggravated battery). For instance, there was no evidence that Harper was unable to control her behavior as a result of her PTSD. The nature of her crime itself suggests she retained the ability to control her thoughts and actions.

[45] As to Harper's history of being abused, this arguably reduced her culpability for her offense and perhaps weighs favorably for her character. However, Harper

carries a heavy burden to show that her character is such for us to conclude that her sentence is inappropriate. For Harper to convince us that her sentence is inappropriate considering her character, she must present compelling evidence that portrays her character in a positive light by highlighting "substantial virtuous traits or persistent examples of good character." *Stephenson*, 29 N.E.3d at 122. As much as we are disturbed by the abuse Harper suffered at the hands of Ethridge and others, Harper has not met her burden of demonstrating "substantial virtuous traits or persistent examples of good character." *See id*. Thus, Harper's twenty-year sentence is not inappropriate considering her character.

Affirmed.

Pyle, J., and Tavitas, J., concur.